[L. A. No. 8539. In Bank.—January 5, 1928.]

FRANK M. KELSEY, Special Administrator, etc., Appellant, v. JARED H. MILLER, Respondent.

Anderson & Anderson, Victor T. Watkins and Edward K. Sheahan for Appellant.

Hunsaker, Britt & Cosgrove, Kimball Fletcher, A. P. Thomson, MacDonald & Thompson and Le Compte Davis for Respondent.

SEAWELL, J.—This appeal, L. A. No. 8539, which will presently receive our attention, is the first in numerical order of three separate appeals pending in this court from judgments affecting the estate of Mary Moore Miller, deceased. The second appeal, L. A. No. 8894, is entitled "Frank M. Kelsey, as Special Administrator of the Estate of Mary Moore Miller, deceased, plaintiff and appellant, *v.* Jared H. Miller, defendant and respondent, Security Trust and Savings Bank, a corporation, Citizens' National Bank, a corporation, and Citizens' Trust and Savings Bank, a corporation, defendants," and was taken by the special administrator from a judgment awarding plaintiff costs only in an action brought to compel Jared H. Miller to account to said estate for all moneys belonging to said Mary Moore Miller which might have come into his hands or that were received by him from her during a seven-year period of assumed marital relations which was terminated by her death and during which period of time said Jared H. Miller and Mary Moore Miller held themselves out to be and lived together as husband and wife. Said third appeal, L. A. No. 9013, entitled "George W. Moore, contestant and respondent, *v.* Jared H. Miller, as executor of the estate of Mary Moore, deceased, Lillian Hays, formerly Lillian Miller, and Russell C. Miller, respondents and defendants," was taken from a decree revoking the probate of the last will and testament of said Mary Moore Miller, deceased. All of said actions, including the instant case, were doubtless brought on behalf of the collateral kindred of said decedent and arise out of the same state of facts and involve many similar issues of law and fact.

The complaint herein, L. A. No. 8539, which was twice amended, will be referred to as the "complaint," rather than as the "second amended complaint." The action was brought to obtain a decree of annulment of a certain deed, dated November 10, 1915, wherein the grantees, Mary Moore Miller, since deceased, and her husband, Jared H. Miller, defendant and respondent, were named as joint tenants, with the right of survivorship, in and to lot 35, Kensington Place, situate in the city of Los Angeles, and valued at $16,500. The money furnished to pay the purchase price of said real property was taken from funds acquired by the wife before marriage. Incidental to the main pur-

pose of the action, plaintiff prays, as the special administrator of said estate, to be let into the possession of said real property, which, since the demise of Mary Moore Miller on February 17, 1921, has been and now is in the possession of said Jared H. Miller by virtue of said deed, and that he and the other defendants named in the action who claim an interest adverse to said estate be forever barred and enjoined from asserting any claim of interest in or to said real property and for general relief.

It is claimed by appellant that two major controlling propositions have been established by the evidence, which, if given the probative force which they are entitled to receive, would inevitably compel a reversal of the judgment. These propositions may be thus summarized: First, that the decree granted to Jared H. Miller on September 15, 1909, by the circuit court of Shelby County, state of Tennessee, in the action of Jared H. Miller v. Edith C. Miller, his former wife, purporting to dissolve the matrimonial bonds theretofore existing between him and said former wife was invalid by reason of certain alleged fraudulent methods employed by Jared H. Miller in obtaining said decree, including collusive conduct on the part of both parties to said action, and said marriage not having been lawfully dissolved, the subsequent marriages of Dr. Jared H. Miller with Mary Moore were void from the beginning. Second, that if matrimonial relations which were maintained by her and Dr. Jared H. Miller were maintained in the belief that she was his lawful wife, when as a matter of law she was not such lawful wife, the deed of joint tenancy being a gift and made in the belief and under the influence of the existence of the marital state, would bring the transaction within the confidential relation clauses of sections 158 and 2235 of the Civil Code, which provides that transactions between trustee and beneficiary ''by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration and under undue influence,'' and the presumption of undue influence would of itself be sufficient to vitiate the conveyance. Other allegations of fraud and undue influence practiced on the part of said Jared H. Miller are alleged to consist in false reports and representations made by him to said Mary Moore to the effect that he was a person possessed of great

wealth and was engaged in handling large affairs and that he possessed unusual capacity, sagacity, and ability as a developer, promoter, and manager of large business and financial enterprises, when as a matter of fact he was insolvent and was lacking in the qualities which he boasted of possessing. These latter representations are offered as affording other and additional inducements which moved Mary Moore to consent to enter into the marriage relation with him and did thereafter influence her to place her estate largely within his control.

The appellant claims that the matrimonial status of respondent Miller and Mary Moore Miller depends upon the validity or lack of validity of said divorce decree granted to said Jared H. Miller from Edith Chesley Miller (whose maiden name was Edith Chesley) by the circuit court of the county of Shelby, state of Tennessee, on September 15, 1909. Dr. Jared H. Miller was a graduate physician and surgeon. His marriage with Edith Chesley was solemnized by his father, the Rev. Frederick M. Miller, at North Brookfield, state of Massachusetts, in 1901. Shortly after said marriage they moved to Palmer, Massachusetts, where they resided for a period of almost three years. There a son, Chesley Russell Miller, was born. Between the years 1903 and 1905, for a period of something like two years, they lived apart. During said period he spent a year in Europe, the wife having returned to her mother's home. In 1905 he resumed the practice of his profession at Boston and his wife rejoined him. They lived together intermittently and unhappily until April, 1909, when the wife again left him. A part of their early married life was spent in Massachusetts and a portion was spent in a Connecticut city, where Dr. Miller was connected with a sanitarium. Edith Chesley Miller, since the granting of the Shelby County decree, remarried and has since been living with her husband in Springfield, Massachusetts. By her deposition, which constitutes a part of the record herein, she deposed to the fact that in the month of May, 1909, a period when she and Dr. Jared H. Miller were living separate and apart, he visited her and requested her to rejoin him and accompany him to Raleigh, Tennessee, where he was to assume the position of medical director of a sanitarium, but that she refused to do so. This request, it appears from the deposition of Edith Chesley Miller, was

made in good faith. A few days thereafter, to wit, June 1, 1909, she filed an action in the courts of Massachusetts praying for a decree annulling the bonds of matrimony then existing between them and alleging acts of cruelty on his part and charging him with being an habitual user of intoxicating liquors and drugs. By her deposition, taken in the instant case, she recanted as to the liquor and drug charges made in her complaint and deposed that said charges had been overstated by her attorney and that her former husband was not addicted to the use of drugs and that the intoxication therein alleged as habitual was occasional only. The complaint seems to have been served on Dr. Jared H. Miller on the day it was filed and he departed from Boston for Tennessee on the following day. No further pleadings were filed or proceedings of any nature taken by said plaintiff, Edith Chesley Miller. Shortly after Dr. Jared H. Miller arrived at the Tennessee sanitarium to assume his duties Edith Chesley Miller arrived in Tennessee, prompted by the belief that her husband had taken their son, Chesley Russell Miller, with him. In this she was mistaken. The boy, who, it seems, was placed by judicial order in the custody of Dr. Miller, was at Summerville, Massachusetts, a short distance out of Boston. Upon one of her visits at the Tennessee sanitarium the proprietor thereof, in the presence of Dr. Jared H. Miller, urged her to rejoin her husband at the sanitarium and resume matrimonial relations with him. This she positively stated she would not do. Within a few days thereafter she returned to Massachusetts, where she afterward remarried and has since resided with her husband. Dr. Miller qualified as a practicing physician of Tennessee in conformity with the laws of that state, and, according to his testimony, which is corroborated by subsequent events, had no intention of again returning to Massachusetts. He remained at the Tennessee sanitarium until it was closed as an unsuccessful venture. He then went to Memphis, where he resided for several months, and finally departed for California to visit his daughter by his first marriage, who was then living at the home of his father, the Rev. F. M. Miller, at Lankershim. Subsequently he entered the practice of his profession at San Francisco and finally located in Los Angeles.

The marriage with Edith Chesley was respondent's second marriage, his first wife having died a short time after the birth of the daughter above mentioned.

The complaint sets out a number of acts and matters which, it is claimed, bore directly upon the execution of said deed and which were fraudulently employed and resorted to by respondent to induce, and which did induce, said Mary Moore Miller to execute said deed. The Shelby County decree is alleged to have been procured by respondent, who was plaintiff in said divorce proceeding, upon the false and fraudulent representation made by him to said court that he had acquired a legal residence in the state of Tennessee, when as a matter of fact he was not a *bona fide* resident of said state, and, further, that both parties to the proceeding were guilty of collusion in causing and procuring said decree to be made. It is next alleged that on March 29, 1911, at the city of Berkeley, county of Alameda, state of California, said Jared H. Miller pretended to contract a marriage with Irene Ayers by engaging in a ceremony which in form conformed to the marriage ceremonial, but which nevertheless was void by reason of the undissolved marriage bond then existing between respondent and said Edith Chesley Miller; that respondent and said Irene Ayers Miller lived together as husband and wife until July 13, 1914; that thereafter and on or about November 17, 1914, by the institution of a false and fraudulent action in the chancery court of the county of Shelby, state of Tennessee, respondent was granted a decree of divorce from said Irene Ayers Miller; that at the time said action was commenced and said decree was granted said court was without jurisdiction of either the person or the subject matter of the action, for the reason that said respondent was not then nor had he ever been a *bona fide* resident of said state; that said Irene Ayers Miller had no notice, actual or constructive, of the pendency of said action or of the entry of said decree until September 14, 1922; that on November 20, 1914, at the city of Jackson, county of Madison, state of Tennessee, said Jared H. Miller and Mary Moore went through the form of a marriage ceremony; that thereafter, to wit, October 13, 1915, at the city of Memphis, state of Tennessee, the same parties, having complied with all the ceremonial forms and statutory requirements essential for the legal solemnization of mar-

riages, went through the form of and engaged in a pretended marriage ceremony for the second time, which was also void by reason of said Miller not having been legally divorced from said Edith Chesley Miller. It is further alleged in this connection that the intermarriage of said Jared H. Miller and Irene Ayers, if said marriage was in law valid, continued to be a subsisting marriage contract, inasmuch as the decree granted by the circuit court of Shelby county on November 17, 1914, purporting to divorce them, was fraudulently procured. As an additional objection and obstacle to said pretended marriage of October 13, 1915, by said Jared H. Miller and Mary Moore, it is alleged that at the time it was purported to have been solemnized there was pending in the superior court of the state of California, county of Alameda, an action wherein and whereby said Irene E. (Ayers) Miller as plaintiff was praying for the dissolution of the matrimonal bonds then existing between her and said Jared H. Miller; that he appeared in and defended said action, but did not mention or refer to the purported decree of divorce rendered in his favor by the chancery court of Shelby County, state of Tennessee, whereby his said pretended marriage with Irene Ayers Miller was decreed dissolved on November 17, 1914; that an interlocutory decree of divorce was rendered on September 28, 1915, by said superior court of Alameda County adjudging the plaintiff, Irene Ayers Miller, entitled to a divorce from said Jared H. Miller, but the final decree was not entered therein until October 5, 1916. The complaint contains no allegation of any other marriage having been performed, in which said Jared H. Miller and Mary Moore were the contracting parties. The answer, however, alleges the celebration of a subsequent marriage ceremony performed at the city of Fresno, California, on May 11, 1918, and the court finds this allegation to be true and that this marriage was legal in all respects.

It is not claimed that any of the marriage ceremonies performed since the decree entered by the circuit court of Shelby County on September 15, 1909, were void as lacking in legal symbols or form, but it is claimed that all subsequent marriages pretended or attempted to have been entered into by said Jared H. Miller since his marriage with Edith Chesley are absolutely void for the reason that no

valid decree of divorce was ever made or entered by any court dissolving said marriage.

The complaint alleges that the court found that at the time of the trial of the instant case said Edith Chesley Miller was a resident of the state of Massachusetts and was known as Edith C. Berriman, and that Irene E. Ayers was a resident of the state of California. It is alleged by plaintiff that at the time of the Memphis marriage, October 13, 1915, Mary Moore was wholly ignorant of the fact that said Jared H. Miller was a married man, and that she was induced by the fraudulent representations made by him to believe and did believe that he was a single man, and there was no legal obstacle debarring him from contracting marriage with her, and that she continued in such belief to the time of her death. Fraudulent representations are alleged to have been made by him to her that he was possessed of large properties and wealth, which representations being accepted by her as statements of truth influenced her conduct in dealing with him to her detriment. His insolvency is also alleged.

It is alleged that after the performance of said marriage ceremony at the city of Jackson on November 20, 1914, said Miller and Mary Moore entered upon matrimonial relations and continued to live together as husband and wife to the day of her death, to wit, February 17, 1921; that as her pretended husband, but well knowing that he was not her lawful husband, said Miller gained and secured her love, affection, and confidence, and by indulging in meretricious representations beguiled her into the belief that he was her lawful husband, and that he was well qualified to manage and care for her properties and invest her funds, and thereby induced her to place into his hands for said purposes sums of money aggregating in excess of $200,000; that as a part of his design he represented that he was about to purchase the real property described in the complaint and present it to her as a home for both; that said Mary Moore expressed a desire to participate in said purchase and to pay one-half the purchase price of said home, and while he pretended to protest against her paying any part of said purchase price with seeming reluctance and unwillingness he finally yielded to her desire in the matter and consented that she pay one-half of said purchase price; believing that he intended to and would pay the remaining one-half of said

purchase price, Mary Moore consented to and agreed with respondent, Dr. Miller, that the deed, which is dated November 10, 1915, and recorded May 11, 1916, should be taken in the names of both as joint tenants with the right of survivorship; that said respondent did not pay the said one-half or any part of said purchase price, but without her knowledge or consent he paid the whole of said purchase price out of the separate moneys and property of said Mary Moore.

The certificate of marriage attesting the solemnization of the marriage of said Jared H. Miller and Mary Moore on October 13, 1915, as authorized by the marriage license theretofore issued, is pleaded at large. A number of sections of the statutes of the state of Tennessee bearing upon the question of the legality of the decrees of divorce granted by the Tennessee courts to respondent from Edith Chesley Miller and Irene Ayers Miller, respectively, and affecting his right to remarry thereafter are incorporated in the complaint and answer, some of which will hereafter be considered.

The answer makes full and complete denials of each and every allegation of the complaint from which any adverse inference or conclusion may be drawn as to the legality of the divorce decree granted to respondent by the Tennessee court in the case of *Jared H. Miller* v. *Edith Chesley Miller*, and of all other allegations that tend to impair the validity of the marriages of Jared H. Miller and Mary Moore. The proceedings instituted in the superior court of the county of Alameda, whereby Irene Ayers Miller was granted a decree of divorce from respondent, are admitted to be true. Respondent alleges that he domiciled in the state of Tennessee on June 5, 1909, with the intention of making and did make said state his place of legal residence, and resided therein until about November 21, 1914. The history of the two marriages entered into by respondent and Mary Moore in Tennessee and the third at Fresno, California, is recited, and in this connection it is alleged that, relying upon the legality of said marriage ceremonies, respondent and said Mary Moore Miller lived together as husband and wife, beginning with the celebration of the first marriage, to wit, November 20, 1914, to the time of her death. The answer specifically denies that said Mary

Moore was not informed as to respondent's matrimonial status as affected by the several divorce proceedings mentioned in the complaint, and alleges in this connection that she was absolutely informed as to each and every marriage and divorce proceeding mentioned in the complaint, and that she knew and was as fully advised as to the legal effect thereof as was the respondent. He denies that he reported falsely on his wealth or his earning capacity, and alleges that he stated to Mary Moore all the facts concerning his financial standing; denies that he was insolvent or was not possessed of any real or personal property prior to and at the times said marriage ceremonies were performed with said Mary Moore, admits that respondent secured, obtained, and had the love, affection, and confidence of said Mary Moore during the entire period of their relationship, but denies that it was obtained by the practice of deception or artifice; admits that from time to time during the continuance of their marital relations Mary Moore Miller gave to him either as a gift outright or made him a joint tenant with herself in various property and sums of money; denies that at the time the real property in suit was purchased he agreed or promised to pay or was expected to pay one-half or any part of the purchase price thereof; alleges that Mary Moore Miller well knew that respondent was at said times without means to purchase said property, and pursuant to her desire and wish she paid the whole of said purchase price from her separate estate, except the sum of $500, which sum was paid by respondent from his separate estate; that said real property was purchased either with the separate funds of Mary Moore Miller given by her to respondent for that purpose or with funds held in joint tenancy by said Mary Moore Miller and respondent, except said sum of $500 furnished by respondent; that said Mary Moore Miller was in possession of all the facts relating to the purchase of said real property, and that the terms of said deed contain the free and voluntary act, wish, and desire of said Mary Moore Miller that he and she should hold and enjoy said real property as joint tenants with right of survivorship, the title to which became vested in him upon the death of said Mary Moore Miller.

The court found that the estate of Mary Moore Miller was not at any time the owner or entitled to the possession of said real property described in said deed; that said claims asserted by said estate as to ownership and right of possession were unsupported by the evidence; that upon the death of Mary Moore Miller said Jared H. Miller became and has since continued to be the owner of said property in fee simple absolute and entitled to the possession thereof. It further found that prior to September 4, 1909, Jared H. Miller and Edith Chesley Miller were husband and wife, and that the decree of divorce granted September 15, 1909, to said Jared H. Miller by the circuit court of Tennessee in the action brought by him against said Edith Chesley Miller was valid and dissolved the marriage tie theretofore existing between said Jared H. Miller and Edith Chesley Miller. The subsequent marriage of respondent with Irene Ayers solemnized in the city of Berkeley, Alameda County, on March 29, 1911, was found to be legal and the decree of divorce obtained against her by respondent in the chancery court of Tennessee on November 17, 1914, was found to be void and of no effect upon the sole ground that said respondent was not at the time of the commencement of the action or at the time of the rendition of the said decree a *bona fide* resident of or legally domiciled in the state of Tennessee. The court also found that at the time of each of the marriages attempted to be solemnized pursuant to marriage licenses issued by legally constituted authority by said Jared H. Miller and Mary E. Moore, to wit, November 20, 1914, and October 13, 1915, respectively, there was a valid, subsisting marriage existing between respondent and Irene Ayers Miller, which continued in force and effect until October 5, 1916, on which day a final decree of divorce was duly filed and entered in the superior court of the county of Alameda, fully and finally divorcing said respondent and Irene Ayers Miller; that the marriage ceremony solemnized at the city of Fresno, state of California, May 11, 1918, was in all respects valid and without legal objection, and from that day hence Dr. Jared H. Miller and Mary Moore became and remained husband and wife; further, that Mary Moore was not at the date of the Memphis marriage, October 13, 1915, ignorant of the fact that said Jared H. Miller was a married

man, nor did he falsely or fraudulently represent to her with intent to deceive her that he was legally capable of entering into marriage with her, nor did he report to her falsely or represent to her that he was a man of substantial means or possessed of large properties in the state of California or elsewhere; that prior to said marriage of November 20, 1914, said Jared H. Miller stated to Mary Moore all the facts concerning his money, property, practice, and current income, and thereafter said Mary Moore knew the respondent's financial condition and that he had no substantial means, money, or property; that immediately after the marriage ceremony performed at Memphis, October 13, 1915, to the time of the death of Mary Moore Miller she and respondent lived continuously together as husband and wife, and during said time Mary Moore Miller believed she was respondent's lawful wife and that such belief was not the result of any fraud practiced on the part of respondent, and that no fraud or false representations were as a matter of fact practiced by said respondent as a means of exerting undue influence over her, but that each enjoyed the love, affection, and confidence of the other. The alleged false representations that respondent promised to pay one-half the purchase price of the real estate involved in this action are found to be untrue; it is further found that the full price of said real estate was paid by Mary Moore Miller with full knowledge that respondent was without funds, and that the title was to be taken in their names as joint tenants with right of survivorship.

The statutes of Tennessee defining the various causes that shall constitute grounds of divorce, among other things, provide:

"Wilful or malicious desertion or absence of either party without a reasonable cause for two whole years." (Sec. 4201, subd. 4.)

"Refusal, on part of a wife, to remove with her husband to this state, without a reasonable cause, and wilfully absenting herself from him for two years." (Sec. 4201, subd. 8.)

"A divorce may be granted for any of the aforesaid causes, though acts complained of were committed out of the state, or the petitioner resides out of the state at the time, no matter where the other party resides, if the peti-

tioner has resided in this state two years next preceding the filing of the petition." (Sec. 4203.)

The statutes contain a provision that when a marriage is absolutely annulled the parties shall severally be at liberty to marry again, except for existing causes not present in the instant case.

The court impliedly found, and upon the record it is inconceivable how it could have otherwise found, that Mary Moore Miller was at all times in full possession of all the facts and circumstances affecting the marital status of Jared H. Miller, and that she was an active, willing, and persistent ally, at all times co-operating with him, and that she largely directed the execution of devious plans whereby said Irene Ayers Miller was to be put aside by him in order to make room for herself in the marital life and affections of respondent. By no means was she mere clay in the potter's hands; but it incontrovertibly appears that she was aggressively active in her determination to make Jared H. Miller her husband and displayed no small degree of initiative talent in the furtherance of her purpose and moved toward her designs with fixed determination. Her many letters and unbroken course of conduct, beginning shortly after she first met the respondent at the city of Los Angeles as his patient and continuing through the period of the pending divorce proceedings which ended with the entry of the final decree of divorce obtained by Irene Ayers Miller in the California court, furnish conclusive proof of her willing and active participation in very much that is chargeable to the respondent in the matter of the dissolution of the Irene Ayers Miller marriage. Mary Moore Miller was not an ordinary person. She was an unmarried woman sixty-two or sixty-three years of age at the time she met Dr. Miller in the spring of 1914 at his office at Los Angeles. Dr. Miller was then aged forty-three years. Mary Moore Miller was then a woman reasonably well preserved, possessing good features, well-mannered, and retaining a lively interest in current matters. Her home was at Marquette, Michigan, and it had been her habit to spend the winters at Los Angeles with companions whom she frequently brought with her from her Michigan home. She was mentally alert, cultured, and well informed as to public men and measures. Her young maidenhood

and middle life were spent in close association with an unmarried brother, Frank Moore, who was a man of wide business and financial affairs and a successful speculator. They made their home together for some thirty-five years, and when he deceased she became his sole heir. He left a large and valuable estate. There were other living brothers and sisters and children of deceased brothers and sisters, most of whom are interested in the three actions herein, which have for their object the acquisition of the estate of Mary Moore Miller. George William Moore, a lawyer of considerable repute, who practiced his profession at Detroit, while not a nominal contestant, is, nevertheless, interested in this litigation and is supporting the cause of the collateral kindred. For many years after the death of her brother Frank, who devised his entire estate to decedent to the exclusion of Attorney George William Moore and the other brothers and sisters, George William was the adviser of his sister in many of her large business transactions, but it is very clear from the evidence and the numerous letters written by the decedent to George William that she had very positive notions of her own on matters of business and finance, and unless a suggestion made by another met with her wishes or judgment she did not hesitate to reject the same. No doubt she had advised with her deceased brother, whose fortune consisted largely in his investments in iron stocks, and by long and close contact with him had obtained an intimate knowledge of his business affairs. Following the death of her brother Frank, decedent lost much of her interest in the home at Marquette and planned and took many trips by train and automobile to such places as she felt would afford her comfort and pleasure. In January, 1914, she met Dr. Miller at his office in Los Angeles and became his patient in what is known as plastic surgery. His wife, Irene Ayers Miller, was his office assistant. Miss Mary Moore had brought with her two lady companions from Michigan and also her automobile and chauffeur. It was during the period of treatment above referred to that Dr. Miller and Mary Moore began their intrigue which ultimately resulted in the divorcement of Dr. Miller and Irene Ayers Miller. It was agreed that inasmuch as Mary Moore had planned to take her companions with her on a trip to Yellowstone Park

during the summer, Dr. Miller should meet her at the station where tourists change from the main line to the branch line leading into Yellowstone Park. In order to disarm her companions it was planned that the meeting should appear to be wholly accidental. During their short stay at the park Dr. Miller and Mary Moore met and made plans to dissolve the marriage contract that stood in the way of their intermarriage. Their stay at the park being concluded, she returned to Marquette, Michigan, and he returned to Los Angeles. Immediately thereafter a correspondence was established. The letters written by Mary Moore to Dr. Miller before the Irene Miller separation are such effective and complete refutations of appellant's claim that Mary Moore was cajoled unwittingly into her several marriages with Dr. Miller, and that she would not have joined in any of the attempted marriages with him had she entertained a suspicion that he was not eligible to contract marriage, that it will be necessary to quote from but a few of the many that might be collated from her very full correspondence. Immediately upon reaching her Marquette home from the park she wrote to him as follows: "Indeed we will consult about *everything* and I feel that we shall be very happy. If we can keep it from everybody knowing that you were not free when I saw you at the park we will do so. Dr., we are not children and if there was a sad mistake in your life there is no harm for us to confide in each other even before you are free—we are doing nothing wrong, but it is just as well to keep it from the outside world if we can. I don't know how long a time it takes to get your freedom. If it can be arranged out of the state it will be better. I believe the Lord is on our side for he never intended that home should be any other than a place ruled by *perfect love and confidence*. . . . I wonder if the lady in San Francisco [reference is to Irene Ayers Miller] will object to a separation? One does not know how she will feel. We will both be so relieved and happy when there is no obstacle in the way. . . . Have burned your others [letters]. Hated to do so but knew it was safer to do so, will burn this one. . . . "

The following portions of two letters written by her on August 23, 1914, and November 3, 1914, express her interest in Dr. Miller's children: "I just know I will enjoy

Lillian—and I hope the children will call me mother—do not expect them to at once but hope they will learn to love me and call me by that dear name some time. . . . When I went to the cemetery I felt that Frank would be pleased to know I had you to love and care for me—Surely some time we will come here and see how things are—I only hope and pray we may live to prove our happiness. I know I shall feel so safe with you—I have no misgivings." "Yes my dear you may depend on me to help you about the children and their future. Am so glad you have them and they will soon be *mine* as well as *yours*."

On September 23, 1914, she wrote to Dr. Miller as follows: "I do hope it [plan to intermarry] will work out all right for we do not want to live apart any longer than we have to." On October 14, 1914, she wrote as follows: "I have done enough for the whole family [her collateral kindred] to have my way about this matter. The point is this, we *want each other* and that is all there is to it. . . . Now, my dear, we shall go ahead and do as we please—now we are going ahead regardless for I am under obligation to *no one* and there are many under obligations to me." If Dr. Miller succeeded in getting his first Tennessee divorce decree from Irene she suggested to him that he telegraph her at once, "Patent granted."

Her purpose to possess Dr. Miller as her husband is further disclosed by the following lines taken from a letter written by her to him November 7, 1914: "My taste does not run to society—steam yachts—private cars and palaces —but a cozy home ruled by perfect love and confidence and peace is what I want and that is your idea of happiness we will have it some day." She expressed considerable anxiety as to the finality of the divorce proceeding that would separate the doctor and Irene. She wrote: "Have everything exactly right, never mind the cost, the correct result is what we want."

In a letter of September 1, 1914, prior to the commencement of any divorce proceeding and well knowing that Dr. Miller was living with Irene Ayers Miller as her husband, she wrote Dr. Miller instructions as to the kind and size of a wedding ring he was to purchase for her. The details of their mutual plans, studied and cunningly devised, by which Dr. Miller, who was known to Mary Moore to be a resident

of California, was to apply for a divorce in Madison County, Tennessee, are elaborately set out in her letters. This divorce, which was held by the trial court to be invalid for want of *bona fide* residence in Tennessee, was entered on November 17, 1914, and she and Dr. Miller went through the form of marriage three days thereafter in the state of Tennessee. Their correspondence prior thereto had been conducted clandestinely and their identity as married persons was adroitly concealed until the second marriage. After their first marriage, which was not announced, they journeyed to Boston and thence to Cuba and finally homeward by way of New Orleans where they separated, leaving upon different trains for Los Angeles. On their matrimonial trip all persons who might chance to know the two or either were avoided. They continued to keep their purported marital relations a profound secret until October 13, 1915, a few days after the entry of the interlocutory decree obtained by Irene Ayers Miller in the divorce action she had brought against Dr. Miller, when they again indulged in another marriage ceremony in Shelby County, Tennessee.

On their first matrimonial venture, and even before the ceremony was performed, Mary Moore Miller supplied Dr. Miller with expense money, and liberally gave him other sums of considerable importance to be used for his needs. Both entertained doubt as to the legality of their first marriage. Lawyers, so the testimony goes, were divided on the question. In due course of time Mary Moore Miller returned to her Marquette home and from there she continued to write Dr. Miller scores of letters, in which she discussed a variety of subjects, but each letter abounded in expressions of ardent affection for him, and she repeatedly manifested impatience at the circumstances which kept them apart. Being in an uncertain state of mind as to the validity of the Tennessee decree purporting to divorce Dr. Miller and his wife Irene, both parties set about to promote the divorce of Dr. Miller and Irene. It appears that their matrimonial relations had not been altogether harmonious under normal conditions, and they became more disturbed after Mary Moore became the doctor's patient. At any rate, Irene returned to her Berkeley home and in due time brought a divorce action in the superior court of the county of Alameda, which resulted in the entry of an interlocutory decree

in her favor on September 28, 1915. The final decree was entered October 5, 1916. Mary Moore largely financed Dr. Miller in his property settlement with Irene. To remove the doubt which they entertained as to the validity of the first decree obtained from Irene in the Tennessee court they proceeded immediately to that state upon the entry of the interlocutory decree granted to Irene by the superior court of the county of Alameda, California, where the second marriage ceremony was performed. En route from her Marquette home she broke the news of her intentions to her brother, Attorney George William Moore, in a letter dated October 12, 1915, in which, among other things, she said: ''As I am stopping over in Chicago a few hours want to write you a few lines about a very important matter. Now don't faint away when I say that I am on my way to be married tomorrow. You remember I showed you *two photos* when you were in Marquette the last time— they are both the man, different positions. I expected you would be up before I left, then would have told you what I am writing now. Our plans worked out a little different from what I expected which accounts for this haste. Have had the matter in mind for some time but have not discussed it with the family or any friends for several reasons. In the first place, I dislike talk and publicity as you know, and did not want it known, nor would I be married in Marquette or Detroit and as this is my first marriage and at my age felt more disinclined than ever to be discussed. Then the question of my means made me feel the same way. When Frank died I heard some complaint, things that some of the youngsters said, for instance, that if he had not left a will they would have had some of the money. So all in all I decided it was nobody's business but my own. I have known the Dr. and his people for nearly two years, in fact he has treated my throat for two winters. . . . Am marrying him because I love him and want him. In fact, we want each other. As you said once when I told you 'I wanted to'—was the best reason in the world. Ever since Frank died have felt without a real home—As I do not care to live with any of my relatives, but am sure I shall have some one to share a happy home with me, for that is what we both like is our home. And I know I am fortunate in my choice, for he brings to us a thoroughly

trained mind, not only in his profession but in business as well, and should anything happen to you I would have some one who is capable of looking after my interests carefully and faithfully. Of course I want everything to go on just the same as it is fixed now.''

Immediately following the marriage of 1915 they resumed matrimonial relations and proceeded from the altar directly to Marquette and Detroit, where they met the relatives and friends of Mary Moore Miller. She exhibited a sense of pride in the attainments of her husband, and represented to her relatives that he was a man of affairs and possessed good professional and business ability. She knew, however, that he was a man without means, as she had all the time voluntarily financed him. In order to give him the appearance of a man of affluence she placed sums of money to his credit. Appellant has argued through hundreds of pages of briefs that her exhibition of marital pride in speaking well of her husband and representing him as a man of means to her relatives is proof positive that she was wickedly deceived by him into such belief, and had she not been thus deceived she would not have consented to a marriage with him. Such a contention is completely and effectively answered by her correspondence with Dr. Miller. In order that he might not hesitate to make known his needs to her she assured him that she had more money than she ought to spend; more than she knew what to do with. Again she wrote: ''All the afternoon was busy writing checks—the end of the month—you know that will soon be your job.'' The evidence overwhelmingly defeats appellant's contention. The evidence is also conclusive to the point that it was the agreement and understanding that Dr. Miller was to retire from the practice of medicine and devote himself to the care and management of Mrs. Miller's large interests, and engage in such business affairs as might be agreeable to both. She transferred her bank accounts from Michigan to Los Angeles as expeditiously as her judgment dictated. She had much correspondence with her lawyer brother, who visited her for several weeks at her Los Angeles home in 1919, concerning her business projects, and was fully aware of his views with reference to her business concerns. She did not take him into her full confidence as to what money or property she intended to make Dr. Miller a joint sharer

with herself, but she did tell him that at least one-half of the purchase price of the property in suit was paid with her funds. This property, which did not exceed $16,500 in value, was encumbered with a mortgage for almost one-half of its value, and said encumbrance was never discharged. The deed to said property stood of record in the joint names of Dr. Miller and his wife from the day it was recorded in 1916 to her death in 1921. Decedent formulated a number of plans which had to do with herself and Dr. Miller as husband and wife, which she afterward executed without disclosing her purposes to her brother. These matters, personal to herself, were revealed to Dr. Miller and, except in a few instances, were concealed from others. In presenting the three cases before us appellant vehemently persists in the view that Mary Moore Miller was brought under the complete control of Dr. Miller by the exercise of some magic power which he likens to hypnotism. It is absolutely incredible that for a period of seven years the exercise of subtle or unnatural influence could have dominated the mind of a person who possessed the personality, intelligence, and business experience which the record shows Mary Moore Miller to have possessed. Her independent acts of charity and the exercise of the faculty of volition refute the claim that she was lacking in willpower and was easily influenced to do the things she did not choose to do. The evidence is all against such a theory. She was charitable in a sensible way, and she was responsive to certain moral obligations which she felt came to her with her wealth. The benevolences which her brother, Frank, had initiated were adopted by her and she contributed annually thousands of dollars to brothers, sisters, near relatives, and family acquaintances who found themselves reduced to necessitous circumstances. Her confidence in and admiration for Dr. Miller did not once falter. And strange as it may seem, a matrimonial alliance which had its inception in intrigue and sin united a twain that lived together in a state of harmony and happiness to the end. Her written words recorded in scores of letters to Dr. Miller and to her brother, George William Moore, her legal adviser in many transactions, stand as unshaken testimonials to her devotion. There is in the record the testimony of two

or three witnesses, either relatives or friends of the parties contesting the right of decedent to make disposition of her estate, who gave testimony tending to show that decedent was unhappy and had lost confidence in Dr. Miller, but this testimony, aside from bearing the earmarks of improbability, is overwhelmed by the written words of the deceased, and is also rebutted by her action and conduct during the entire period of their relationship.

In 1919 she took up with her brother the subject of making her will, and wrote several letters telling him just how she wished him to draw the will. No unprejudiced mind can read those letters without becoming convinced that decedent in her instructions was acting freely, voluntarily, and intelligently. The following is but a sample of the many expressions which are to be found in her letters. It deals directly with testamentary intention:

"Los Angeles, April 7th, 1919.

"Dear George:

"The revised copy of the will received and is exactly what I want and fully carries out my wishes. I see no reason why I should ever change it as it seems to me to be as just as possible all around. The way it was before it would have cut the Dr. off with $2400.00 a year, which I would not want. He is the one who is spending his life with me, has for several years and expect will for many more. Helps me in all the details of life, assists me in many ways. Should anything befall you I would have to depend on him much more. Companionship and service of this sort cannot be measured in money, but my first wish and care is for him naturally and I want him fully provided for while he lives."

The will as finally executed carries on after her death many of the benevolences which she practiced in life, and some of those now opposing the probate of her will are named as beneficiaries therein so long as they shall live. We have no disposition to mitigate the wrong she wrought by counseling, aiding, assisting, and abetting the divorcement of Dr. Miller and his wife Irene. That, however, is the only shadow that darkens a life that abounded in benevolent and gracious offices. But her transgression, however grievous, did not, *per se,* work a forfeiture of her right to

dispose of her property on the same terms that are guaranteed to those who have not so transgressed.

Appellant seeks to bring to his support sections 158 and 2235 of the Civil Code, which provide that transactions between husband and wife during the existence of the marital state by which one of the spouses obtains any advantage from the other are presumed to be entered into without consideration and under undue influence. That Mary Moore Miller had the opportunity of independent advice in all of her transactions with Dr. Miller is not a debatable question. From the first marriage ceremony to the second a period of one year elapsed, during which time she resided in the state of Michigan and Dr. Miller resided at the city of Los Angeles. All of this time she was in constant communication with her lawyer brother, personally advising with him on any matter she chose to submit to his judgment. She was given to travel and visited a number of the prosperous cities of the middle west during this period of separation. It also appears that she actually came into personal contact with lawyers. In fact, she paid the fees of one, if not both, in the Irene Ayers Miller divorce action. With her experience in business matters generally is it not at least likely that having employed lawyers for another she was well advised of her right to employ one for herself? The court found, and the evidence abundantly supports the finding, that Mary Moore Miller was at all times fully advised as to Dr. Miller's matrimonial status and prior to the time of the purchase of the real property involved in this proceeding she knew that Dr. Miller was without means to purchase said property, and she at all times fully intended that the whole purchase price should be paid from funds to be supplied by her to him. That she would have procured the deed to be made as it appears of record, even though she doubted the consummation of a technical legal marriage, there can scarcely exist a doubt in the light of her attitude to Dr. Miller.

In the three cases before us the Tennessee decree of 1909, purporting to divorce Dr. Miller and Edith Chesley Miller, is vigorously attacked by the representative of the collateral heirs on the theory that if that decree is adjudged to be invalid for want of jurisdiction of the court to render it, then it must follow that Dr. Miller and Edith Chesley

Miller, who has since married, are still husband and wife, and further, that that status had a nullifying effect on his subsequent marriage to Irene Ayers and his three later marriages with Mary Moore, and that in consequence thereof all property rights that were acquired by Dr. Miller are tainted with the fraud resorted to in obtaining said decree, and all of said transactions must, as well as the will executed in 1920, fall together. Conceding the decree to be void, this would not inevitably follow. But inasmuch as it has been regarded by the collateral heirs as the keystone of all the cases, especially the will contest, we will not deny it consideration.

The petition filed by J. H. Miller against Edith Chesley Miller in the Shelby County circuit court on September 4, 1909, alleged the marriage and the birth of a son, who was in legal custody of plaintiff, Dr. J. H. Miller. Petitioner alleged that he was a resident of Tennessee and that defendant was a nonresident of that state. He alleged as grounds of divorce that his wife had wilfully and maliciously deserted him and declared that owing to incompatibility of temperament they could not live together. He next alleged that his wife would not remove into the state of Tennessee with him, and that he held "a letter showing notwithstanding his consideration and efforts she adheres to her position and declares a separation is the proper course." The following waiver of process, which was mailed to the clerk of the court by his wife, was in the handwriting of Dr. Miller and was executed by her in Massachusetts and was filed as a record in the case:

"I, E. C. Miller, hereby waive notice, copy, pleading, term and agree that the application of J. H. Miller for divorce from me shall be set and tried instanter.

"Witness my hand the 10th day of September, 1909.

"E. C. MILLER."

The *pro confesso* which Edith Chesley Miller executed and caused to be filed as a record in the case constituted an appearance on her part and she has never since questioned its true intent or binding effect. The cause regularly came before the circuit court of Shelby County, state of Tennessee, for hearing, and that court made and entered its decree on September 15, 1909, as follows:

"This cause came on this day to be heard on the bill of complaint for divorce, the *pro confesso* here and now taken and entered against the defendant, and the oral testimony of witnesses examined in open court, from all of which it satisfactorily appeared to the court that complainant is entitled to the relief sought on the ground of desertion without provocation on the part of the complainant, and her refusal to move into this state with him all resulting from incompatibility of temperament;

"It is therefore ordered, adjudged and decreed by the court that the bonds of matrimony heretofore subsisting between the complainant, J. H. Miller, and the defendant, E. C. Miller, be and the same are hereby absolutely dissolved and forever held for naught.

"It is further ordered that the defendant pay the costs herein accrued, for which execution may issue."

Surely no fraud was committed against Edith Chesley Miller on any of the grounds which constitute the basis of the cases cited by appellant, nor was the service substituted, and she makes no claim that there was fraud or insufficient service. Her ultimate object in filing her bill of divorce against Dr. Miller in Massachusetts upon the eve of his departure for Tennessee was made more certain of attainment by the divorce action taken by Dr. Miller several months thereafter. Neither do the facts altogether harmonize with the theory of collusion, as there would have been no occasion for a duplication of divorce proceedings if there had been a collusive agreement between the parties.

In considering what effect should be given to the foregoing decree in the light of the full faith and credit clause of the constitution of the United States, it may be proper at this time to observe that neither one of the parties to the 1909 divorce proceedings, nor the issue of the marriage sought to be dissolved, a son, are attacking said decree, but the attack is made by the collateral kindred of the wife of the last marriage, who, according to the finding of the trial court, was fully informed as to the 1909 decree. Edith Chesley Miller and Dr. Miller each having remarried another person, respectively, are estopped from denying the validity of said decree. Even if the Tennessee decree showed upon its face want of jurisdiction of the court to make said decree and was consequently void on a

collateral attack, each of the spouses having thereafter remarried another person, they are held by all the authorities to be estopped from questioning the former void decree. (*Bruguiere* v. *Bruguiere*, 172 Cal. 199 [Ann. Cas. 1917E, 122, 155 Pac. 988].) There is no ground upon which the claim may be predicated that Dr. Miller did not intend to become a *bona fide* resident of the state of Tennessee when he departed for that state, nor that he did not in fact become a *bona fide* resident. His preparation to depart from Boston and the request he made in good faith of his wife to accompany him, qualifying himself to practice his profession upon arriving there and remaining in the state several months after the sanitarium of which he was medical director had closed, and not returning to Massachusetts, but finally coming to California to visit his sick daughter, who was residing at his father's home at Lankershim, and remaining in California, are circumstances which strongly corroborate his testimony to the effect that when he left Massachusetts he did so with the intention of making Tennessee his legal domicile. The fact that he left Massachusetts after his wife had commenced a divorce action against him in that state tends to rebut the claim that he left Massachusetts with the fraudulent intent of establishing a domicile for the purpose of divorcing her. It is upon this theory that the decree is attacked. The trial court found against appellant on that issue, as well as upon the issue that the Tennessee court lacked jurisdiction of the subject matter, and against the further claim that the judgment was void upon its face upon the ground that the statutory requirements of two years' residence by the plaintiff in Tennessee and the desertion or absence on the part of the offending party for a period of "two years" were neither alleged in the complaint nor incorporated in the judgment. ▆ A judgment upon a collateral attack will not be held invalid on account of the omissions last above pointed out. The Tennessee court had jurisdiction of the person by reason of her appearance, and it had general jurisdiction of divorce causes. The trial court found that Dr. Miller was a *bona fide* resident of the state of Tennessee at the time the action was commenced and at the time the decree of divorce was entered. ▆ We must presume, in the absence of a contrary showing, that the laws of Tennessee are the same as

ours affecting similar subjects. It is the law of this state that the judgment of a court having general jurisdiction of the subject matter involved in the judgment cannot be successfully attacked in a collateral proceeding because of an imperfect or defective complaint in the action in which it was rendered. If the facts stated in the complaint are not sufficient to entitle the plaintiff to the relief demanded therein and awarded by the judgment, the action of the court in decreeing otherwise and rendering its judgment in accord with the prayer of the complaint can be nothing more than error. A failure to allege that the plaintiff resided in the state and county in which the action is brought for the period of time prescribed by section 128 of the Civil Code does not affect the jurisdiction of the court to hear and determine the action provided the court obtained jurisdiction of the defendant. (*Estate of McNeil*, 155 Cal. 333 [100 Pac. 1086], citing other cases.) The court in the instant case obtained jurisdiction of the defendant. Any fraud committed as to the issue of residence was intrinsic and not extrinsic, and the person injured thereby was Edith Chesley Miller, who filed her appearance.

In *Hamblin* v. *Superior Court*, 195 Cal. 364 [43 A. L. R. 1509, 233 Pac. 337], this court further said: "The provision of section 128 of the Civil Code, forbidding the granting of a divorce unless the plaintiff has been a resident of the state and of the county for the time specified, is of a similar character. This requirement has sometimes been spoken of as 'jurisdictional' (*Flynn* v. *Flynn*, 171 Cal. 746 [154 Pac. 837] ; *Gould* v. *Gould*, 188 Cal. 505 [205 Pac. 1072]). But it has never been so decided, so far as we are advised, in any case wherein that question was actually involved. In the case in which this question has been actually involved and decided it has been held that this requirement is not jurisdictional, and that the failure to comply with it is nothing more than error in the exercise of jurisdiction (*Estate of McNeil*, 155 Cal. 333, 339 [100 Pac. 1086] ; *Dahne* v. *Superior Court*, 31 Cal. App. 664 [161 Pac. 280] ; *Bullard* v. *Bullard*, 189 Cal. 502, 506 [209 Pac. 361]). The same reasoning applies with equal force to the provisions of section 130 of the Civil Code, and it follows by parity of reasoning that these requirements are not jurisdictional and that a failure to comply with them results

in mere error correctible only by means of a direct attack by appeal or motion in the same case."

Counsel has cited a long list of cases, of which *Andrews* v. *Andrews,* 188 U. S. 14 [47 L. Ed. 366, 23 Sup. Ct. Rep. 237] , *Bell* v. *Bell,* 181 U. S. 175 [45 L. Ed. 804, 21 Sup. Ct. Rep. 551] , *Streitwolf* v. *Streitwolf,* 181 U. S. 179 [45 L. Ed. 807, 21 Sup. Ct. Rep. 553], and *Haddock* v. *Haddock,* 201 U. S. 562 [5 Ann. Cas. 1, 50 L. Ed. 867, 26 Sup. Ct. Rep. 525], are typical, which are declaratory of the rule announced in many state courts. It is well expressed by former Chief Justice Shaw in *Bruguiere* v. *Bruguiere, supra,* as follows: "It is a well-established proposition that where one spouse goes to a state other than that of the matrimonial domicile and there obtains a divorce under a residence simulated for that purpose and not in good faith, the judgment is not binding upon the courts of other states of the Union, and upon proof of the fraudulent residence and of the fact that the divorce is obtained by substituted service only, it may be held void in any other state than that in which it was rendered. (*Estate of James,* 99 Cal. 374, 377 [37 Am. St. Rep. 60, 33 Pac. 1122].) Whether it would be held valid in the state in which it was rendered is a question depending upon the policy and law of that state."

The rule, of course, rests upon consideration of public policy, and was adopted by courts in order to preserve the rights of wives and the issue of marriages against faithless husbands who deserted them without cause and fled to other states and gained a residence for the purpose of obtaining a divorce from the abandoned wife. There is not one of the controlling facts upon which the decisions in the cited cases are placed that is to be found in the instant case. In each of said cases the removal of the husband from the matrimonial domicile was found to be with the intent of simulating a residence for the purpose of obtaining a divorce from the wife and the service of process was constructive. The actions to annul the decree in those cases were brought by the injured spouse. The fraudulent purpose that moved the husband to leave the matrimonial domicile and gain a residence in another state unquestionably forms the basis of all of those cases. The trial court found against

the existence of all of the facts that constitute the real grounds of those cases.

But if it be conceded that the 1909 decree is assailable by appellant and is void for the reasons urged against it, this circumstance would not establish the nonmarriage status of Dr. Miller and Mary Moore Miller, which it is incumbent upon appellant to do in order to avail himself of the force of the argument that Mary Moore Miller was deceived and misled by Dr. Miller's machinations into the belief that she was his legal wife. The last marriage ceremonial to which Dr. Miller and Mary Moore Miller were parties, performed at Fresno, California, May 11, 1918, estops appellant from questioning the matrimonial status of the parties to said marriage. ■ The mere proof of a prior marriage and the continued life of both spouses is not sufficient to make a case against a *second ceremonial marriage*. There must be a further showing that the first marriage had not been set aside by judicial decree. ■ There is a very strong presumption in favor of the legality of a marriage regularly solemnized. ■ The marriage ceremony of May 11, 1918, was solemnized under all the forms of law after the entry by Irene Ayers Miller of the final decree divorcing her from Dr. Miller. The deposition of Edith Chesley Berriman (formerly Miller) was taken and not one word of testimony was given by her as to whether she had obtained a decree of divorce from Dr. Miller. Neither was it made to affirmatively appear that he had not obtained a valid decree against her. This being so, Dr. Miller and Mary Moore Miller were husband and wife under the laws of this state before the will was executed and continued to be such until her death, whatever may have been their marriage status prior thereto. (*Estate of Hughson*, 173 Cal. 448 [160 Pac. 548]; *Marsh* v. *Marsh*, 79 Cal. App. 560 [250 Pac. 411].) Aside from this, the California decree of divorce in which Irene was plaintiff and Dr. Miller was defendant became final October 5, 1916. It has not been attacked in any direct proceeding and only collaterally, if at all, in this proceeding. In the matter of the *Estate of Lee*, 200 Cal. 310 [253 Pac. 145], this court said:

■ "A divorce proceeding in so far as it relates to the marriage relation of the parties to the action and the

termination of the marriage status is a proceeding *in rem* (*In re Newman*, 75 Cal. 213 [7 Am. St. Rep. 146, 16 Pac. 887]). Such an action is brought for the purpose of establishing judicially the matrimonial status of the parties and, if it be found that a matrimonial relation exists, then for the purpose of a dissolution of that relation (*Gridley* v. *Boggs*, 62 Cal. 190, 202; *De la Montanya* v. *De la Montanya*, 112 Cal. 101 [53 Am. St. Rep. 165 [32 L. R. A. 82, 44 Pac. 345]). As a judgment *in rem* it is binding upon all the world as to the determination of the marital status of the parties and is immune from collateral attack (*People ex rel. Fogg* v. *Perris Irr. Dist.*, 132 Cal. 289 [64 Pac. 399, 773]; 15 Cal. Jur. 239) except on grounds specified by the code (sec. 1916, Code Civ. Proc.), none of which is urged here. . . . ''

The policy of this state on this subject is made clear by the foregoing pronouncement. ■ The question of marriage and divorce is one of public policy committed largely to the sound discretion of the several states, as is well demonstrated by the divergent views of the several courts of the Union in dealing with the subject. The decisions are not uniform, but all extend the judicial arm to protect the matrimonial status from the fraudulent designs of either of the spouses. From a consideration of the marriage status of the persons that may be seriously affected by this proceeding, the policy of the law would require the sustaining of the judgment of the trial court if it can reasonably be done. It is not necessary for us to rely upon such an exigency in this case, as the evidence and the law unquestionably impel an affirmance of the judgment.

■ Appellant assigns as error the refusal of the court to receive in evidence a letter written by Dr. Miller to his attorney, dated October 19, 1915, which purports to have been written with his wife's consent and in substance was a request made to his attorney to draw up a document predetermining which one of the two died first in the event that both were killed in an accident. The letter was written in anticipation of an automobile trip from Marquette to Washington, D. C., New Orleans, and thence to Los Angeles. In the letter he said: ''Should anything unforeseen happen to us, both want you to understand and get my share for my kiddies, for whom I am doing many

of these things." He spoke of the Marquette property being very valuable and of the legal effect of the Irene Ayers divorce of 1914 and other matters personal to himself. He admonished his attorney to file carefully away from the office force certain papers and to burn his letter. The latter request was not observed. One of the attorneys for appellant gained permission of Dr. Miller's attorney to examine his letter files containing Dr. Miller's correspondence and while so doing, and without permission, took from the files the letter in question. The offer to introduce in evidence said letter was objected to as being a privileged communication between client and attorney. The admission of the letter was not pressed and it was not received in evidence. The court would have been justified in rejecting it for a number of reasons. It was clearly privileged and its contents had little, if any, relevancy to the issue.

An examination of an excessively large and overfull record convinces us that the judgment of the trial court must be sustained. The judgment appealed from is, therefore, affirmed.

Waste, C. J., Richards, J., Shenk, J., Curtis, J., Preston, J., and Langdon, J., concurred.