Commonwealth ex rel. *v.* Yarnell et al., Appellants.

Argued September 28, 1933.   Before FRAZER, C. J.,
KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*H. Scragg,* with him *Cole B. Price* and *John H. Price,* for appellants.

*Evlyn Latta Lutes,* for appellee.

OPINION BY MR. JUSTICE MAXEY, November 27, 1933:

The possession of a boy, Kenneth P. Thompson, born June 2, 1922, is the subject of this controversy between his father and mother, who were married in 1912, and who were divorced in the State of Delaware by a decree nisi in September, 1925, and by a final decree in 1928. Habeas corpus proceedings were instituted by the father in the Court of Common Pleas of Lackawanna County in August, 1930, and a writ issued. The petition alleged that Else I. Thompson, the child's mother was living with one Llewellyn R. Yarnell, the other respondent, as the latter's wife, and that neither of the respondents was fit or qualified for the care and education of the child.

On August 28, 1930, the court awarded the child to the general custody of his mother and granted the father certain restricted rights of visitation.

In July, 1931, the relator Thompson filed another petition in which he averred that the respondents "were living together as man and wife, contrary to the laws of the State of Pennsylvania, which situation is regarded by the relator as entitling him to the custody of his own son, said Kenneth P. Thompson," and the petitioner requested further consideration of the original petition. Else I. Yarnell answered, inter alia: "...... That from his [the child's] birth to the present time she has been and is his guardian by nature, and that her care of him is necessary for his present and future welfare. ...... That in her care and guardianship the moral and religious education of her child is and will be suitably attended to." She further set forth that she had been divorced from Paul F. Thompson in the State of Delaware on the ground of cruel and barbarous treatment, and that the general custody of the child was awarded to her by the Superior Court of Delaware, and that the petitioner, Paul F. Thompson, was sentenced by the Court of Delaware to imprisonment for one month for violating the decree with regard to the custody of the child. She denied that Paul F. Thompson was qualified financially or otherwise to care for the child and averred that since her divorce from the relator, he had not contributed to the support, maintenance or education of the child in any way. She set forth that she was married to Llewellyn R. Yarnell on May 31, 1929, and that she and her husband maintain a home in Scranton and that they support and educate the child in a suitable manner.

The case proceeded to a hearing on August 25, 1931. The relator called as a witness his maternal aunt. She testified that she had been a public school teacher and a Sunday school teacher for many years, and that Mr. Thompson was financially qualified to take care of his son, and was an industrious, hard-working man, that Mr.

Thompson had rooms in the house of one Inglebert at Ardmore, and that when the summer vacation was over, she (the witness) would live in Delaware, but the boy would live in Ardmore with his father, but that when the father needed her for his boy she would come to Ardmore. The relator testified that he was financially and otherwise able to have the boy properly cared for, that his business was "measuring men for clothing" and that "he had traveled" but at the present time he was working on "the main line from Ardmore as far as Malvern."

Llewellyn R. Yarnell, respondent, was called by the relator as if for cross-examination. He testified that he married Sarah J. Hulett in England in 1915, that he came to the United States in 1924, that his wife later came to this country and that they resided in Delaware, but that she was now living in England. Their two children, a girl born in 1916 and a boy born in 1922, are also in England. He said he was divorced from her in Mexico in 1929 and offered in evidence a paper which purported to be a Mexican divorce decree. It was in Spanish but an English translation of it was produced. His first wife was at the time of the divorce proceedings living in England.

Else I. Yarnell, the other respondent and the mother of the boy in controversy, when called as if for cross-examination, testified that she was married to Llewellyn R. Yarnell on May 31, 1929, that she, her husband and the boy reside in a six-room house and that they have domestic help, and that the boy goes to public school, church and Sunday school.

The respondent offered in evidence an exemplified copy of certain records of the Superior Court of Delaware, showing that Paul F. Thompson had instituted habeas corpus proceedings there against Else I. Thompson et al., for the custody of their child, and that the Superior Court on July 10, 1925, awarded the general custody of the child to the mother, subject to the father's right to have the child on every second Saturday and Sunday and

during one week in the summer. These records showed further that in 1929 an attachment of contempt was issued against Paul F. Thompson for disobedience to the court's order and he was sentenced on March 30, 1929, to imprisonment for one month. On the same day the court decreed that "the child having been produced in this court, now being a ward of this court, that all orders heretofore made with respect to the custody of the child are suspended and the child is given to the general custody of its mother."

In the opinion filed in this case on September 14, 1932, by NEWCOMB, P. J., appears the following: "The question raised is that of his former wife's moral fitness because relator says she is living in a state of adultery with Yarnell, her codefendant, whom she had married in Maryland in 1929. The point is sought to be made that Yarnell then had a lawful wife living in England. He had been divorced from her in Mexico in February, 1929. Hence, the chief contest here has arisen out of relator's attempt to impeach the validity of that decree. But notwithstanding counsel's earnest argument and elaborate briefs it is believed that in the absence of some property right to be affected the decree is not open to collateral attack. That Mr. and Mrs. Yarnell are of ample means, are living in the normal relation of husband and wife, that they have a good home in one of the best residential sections of the city, that the boy is being well reared with good school advantages, is not questioned. Relator has three rooms in an apartment house on Ardmore Road in Delaware County. Just what his means are does not appear; but it would seem that his occupation keeps him on the road much of the time. He has no housekeeper save as an aunt living in Delaware visits him occasionally when some attention is given to his living quarters. Hence, having in mind the child's best interest and his permanent welfare, it is believed that his present custody should not be disturbed."

This case was appealed to the Superior Court. That court said: "...... The moral fitness of the wife as affected by the marital status of the two respondents was but one element to be considered below or here. If a fraction of the time devoted to the Mexican divorce had been expended in furnishing other facts as to the relative ability and fitness of the parties to nurture, rear, and educate this child, our problem would have been simplified, and we would have been on firmer ground in adjudicating the controversy. ...... More evidence should have been produced as to the qualifications of the parents financially, physically, morally, and spiritually to rear the unfortunate child. ...... The paramount consideration in cases of this nature is the welfare of the child. The lower court, with the advantage of having seen and heard the parties, has decided the issue in favor of the mother, and we would ordinarily hesitate to interfere with that decision. After a careful consideration of the testimony by the members of the court, we have come to a different conclusion."

The Superior Court stressed the fact that the mother had no means of her own and was dependent entirely upon her second husband for her own support and the support of the child, without any indication on the part of Yarnell that he would assume any responsibility for the maintenance and education of the child, Kenneth Thompson.

The Superior Court also said "when Mrs. Yarnell was under cross-examination, the libellant offered to show the relations between Yarnell and his alleged wife, Else I. Yarnell, prior to their marriage. The lower court sustained the objection to this order and held the libellant to proof of criminal relations between the parties. This testimony should have been received as it bore on the moral fitness of Else I. Yarnell to have custody of the child. ...... We cannot avoid the conclusion that with the father the child is assured of a more satisfactory home and permanent maintenance. Taking the testi-

mony as a whole, we believe that the best interests of the child will be promoted by placing him in the custody of the father with the right of the respondent to visit the child in his home or at some other place at reasonable times, and on occasions during week-ends and the like to have him in her control."

We cannot agree with the conclusions of the Superior Court. The undisputed fact that the child was amply supported at the home of his mother and stepfather clearly raises the presumption that the mother in the household of her second husband was financially able to support this child. It was not necessary for her to show possession of independent means. There is nothing in the record contradicting Mrs. Yarnell's averment in her answer that "she and her said husband support and educate said child in the manner benefitting and suitable to his expectations and will continue to do so, and that his associations are and will be exclusively with persons of upright character and moral and religious habits." The fact that Yarnell appears adversely to the petition of relator in this case furnishes proof that he as a foster-parent is willing to assume the responsibility for the maintenance and education of the child.

The allegation of the lack of moral fitness of the mother to care for her child was not sustained. In attempted support of this allegation, relator endeavored first to establish that the Mexican divorce decree of the child's stepfather was invalid, and then he would have the court infer from this fact, if established, that the mother of the boy having married Yarnell after this Mexican divorce, was therefore morally unfit to take care of the child. The answer to this is, first, that the validity of this Mexican divorce must as the record stands be recognized. Mexico is a sovereign state and the judgments of its courts are entitled to the respect everywhere accorded the judgments of the courts of sovereign states until those judgments are invalidated in the proper manner in the courts of another jurisdiction. "Foreign judg-

ments are recognized and enforced in this country because of the comity due by one nation to another and to its courts and decrees": 15 R. C. L., page 907, section 388; Hilton v. Guyot, 159 U. S. 113. It is true that a foreign divorce may be attacked collaterally by the defendant spouse where his or her rights are involved. It may also be attacked by persons claiming under the defendant spouse. The right to impeach collaterally a decree of divorce made in another state by showing fraud or want of jurisdiction has been frequently recognized. See German Savings & Loan Society v. Dormitzer, 192 U. S. 125, 128; Andrews v. Andrews, 188 U. S. 14, 39; 19 C. J., page 375, sections 844, 845; Rex v. Brinkley, 14 Ont. L. R. 434, and Rex v. Lolley, 168 English Reports 779. Third persons whose rights are concerned may under certain circumstances attack a divorce collaterally. See Adams v. Adams, 154 Mass. 290, 28 N. E. 260, and Hollingshead v. Hollingshead (N. J.), 110 Atl. Rep. 19, syllabus 3.

However, in order to invalidate the Mexican divorce decree it would have to be shown not only that the then respondent (the first Mrs. Yarnell) was not in Mexico at the time of the proceedings but that she was never properly served with process, was not represented by counsel, and that the cause of action did not arise in the foreign jurisdiction. See Grossman's Est. (No. 1), 263 Pa. 139, 106 A. 86; Duncan v. Duncan, 265 Pa. 464, 109 A. 220, and Haddock v. Haddock, 201 U. S. 562.

Secondly, even if it had been established that the Mexican divorce was invalid that fact in itself would not prove the moral unfitness of Mrs. Yarnell unless it was further shown that she married Yarnell well knowing that he had never been legally divorced. When a woman marries a man in the honest and apparently well-founded belief that he has been legally divorced from his first wife, the fact that he had not been so divorced would no more reflect on her moral fitness to take care of her own child than would her marriage to a man in the honest

and apparently well-founded belief that his first wife was dead when, in fact, she was not dead. While in prosecutions for bigamy it has been held that the alleged bigamist's mistake *in law* as to the former marriage having been legally dissolved is no defense, this is because of the language of the statute defining bigamy, and it is an exception to the general rule that a person cannot be convicted in a criminal proceeding unless he had "a guilty mind" when he committed the act charged. Clearly when the allegation in effect is, as here, that Mrs. Yarnell had "a guilty mind" when she married Yarnell and that she is therefore "morally unfit," evidence that she married Yarnell when he was not legally divorced (if such had been proved) would have been irrelevant unless followed by proof that she had knowledge of the illegality of his divorce.

The third assignment of error filed by the appellant in this case in the appeal to the Superior Court reads as follows: "The court erred in refusing to admit answers to questions propounded by relator's counsel for the purpose of showing: (1) that respondent's alleged Mexican divorce was and is absolutely void, having been obtained by him fraudulently and without jurisdiction; (2) the credibility of respondents as witnesses; (3) the moral unfitness of respondents to have the care of relator's child. Such offerings appearing on pages 24a, 25a," etc. (mentioning altogether sixteen different pages). These assignments of error are made improperly. Even if we overlook this irregularity we find no offer of evidence which, if received, would have supported the allegation of Mrs. Yarnell's moral unfitness. She was asked: "Upon the occasion of your going to England with Mr. Yarnell in 1928, who paid your expenses?" This was objected to and the objection was properly sustained. She was also asked: "Did you go to England with Mr. Yarnell in 1928?" This was objected to and the court aptly said: "...... If you are prepared to show that they went there in unlawful relations all well and good;

but the mere fact that they went to England doesn't amount to anything." She was asked: "Is it not true that you ceased your employment with the DuPont Company in Wilmington, in 1928, before you went to England with Mr. Yarnell and have never been employed at a salary or upon wages or in any other gainful occupation since?" The objection to this was also well taken.

Affirmative answers to these and similar questions justly excluded by the court would constitute no reflection on the character of either respondent. Their going to England together in May, 1928, was entirely consistent with the good morals of each. Incidents which may give rise to malicious gossip or innuendoes often fall far short of supporting an impeachment of a person's moral fitness. The trial judge pertinently said to the relator near the close of the case: "If you have any evidence supporting this allegation [of unlawful relations between the respondents] I think it is high time we got to it." If relevant offers to prove Mrs. Yarnell's moral unfitness had been made and rejected, a new trial of the issue should have been ordered.

Not only did the relator fail to maintain his allegation against Mrs. Yarnell's moral fitness but the record contains proof of his own moral unfitness to take care of his child. The relator was by the courts of Delaware adjudged guilty of cruel and barbarous treatment of his wife, and it is reasonable to assume that the same kind of treatment a man accords his wife he will accord his child. It is also on record that he so contemptuously defied the decree of the court of Delaware that he was sent to prison for thirty days. It also appears that while the child is now being cared for by his mother and stepfather in a good home, relator has no real home where this child could be properly cared for, and the child would most of the time be in the care of his father's unmarried aunt. Confronted with the question: Should this boy for his own well-being be awarded to the custody of the mother who bore him and who has cared for

him kindly and constantly during the eleven years of his life, or to the nominal custody of his father who has seen him only intermittently since he was three years old and to the actual custody of a maiden grand-aunt, we have no hesitancy in deciding that he should remain where he is, that is, with his mother.

The judgment of the Superior Court is reversed and the order of the Court of Common Pleas of Lackawanna County is reinstated.