[L. A. No. 19218.   In Bank.   July 30, 1948.]

CHARLES J. L. VICKERS, Petitioner, v. THE STATE BAR
OF CALIFORNIA, Respondent.

Morris Lavine for Petitioner.

Fairfax Cosby and Jerold E. Weil for Respondent.

THE COURT.—Upon the petition of Charles J. L. Vickers, this court issued a writ to review a disciplinary proceeding in which the Board of Governors of The State Bar recommended that he be disbarred.

The notice to show cause charged Vickers with three counts of professional misconduct.  First, The State Bar asserted, he

intentionally misled the court in connection with a petition for special letters of administration upon the estate of Olive Agnes Vickers, also known as Agnes Kirk. The second count alleged that after accepting a fee for legal services, he told a client that his action would soon come to trial when, in fact, no complaint had been filed. Finally, Vickers was charged with the appropriation of a typewriter belonging to a client. Each of these charges was denied by the petitioner and the matter proceeded to a hearing before a local administrative committee.

As a witness in his own behalf, Vickers related that on September 2, 1942, in the Superior Court of Los Angeles County, his wife (nee Georgia Moore) obtained an interlocutory decree of divorce. Olive Kirk was an acquaintance at this time. On a visit to Ohio, she became ill and Vickers joined her there. Early in November they started for California by plane, but on account of travel priorities only got as far as El Paso. They went to a hotel there and registered as man and wife.

On November 21st, about a week after their arrival, Vickers consulted William A. Cocke, an El Paso attorney specializing in Mexican divorces. There is considerable conflict in the testimony as to how Cocke's name was obtained. Vickers' testimony was that Olive made the appointment and persuaded him to go to see Cocke. At a meeting in Cocke's office on that day, certain legal aspects of the proposed proceeding were discussed and a number of papers were signed. Some of them concerned statistical data in regard to the marriage of Vickers and Georgia Moore; others, including a power of attorney, written in Spanish, Vickers signed without reading or inquiring about their contents.

The same day, Vickers and Cocke crossed the international boundary line to Juarez, Mexico, and in a public building there Vickers signed "some Spanish roll." Vickers testified at one time that he believed this signature was "for the divorce" but he later said that it was only for the purpose of establishing residence, which accords with Cocke's explanation of the document. Several persons were present at the time of signing the roll but no testimony was taken nor was anything translated for Vickers. He "got a divorce decree" at that time, he told the committee, but his later testimony shows that he was not referring to a judgment in writing. Vickers and Cocke then returned to El Paso and Vickers did not make any further appearance in the matter.

Two days later, in El Paso, upon an affidavit stating that he was a single man, Vickers obtained a license to marry Olive. They immediately went through a marriage ceremony before a local judge. The following day, a complaint for divorce by Vickers against Georgia was filed in the Civil Court of First Instance in Juarez.

After the marriage ceremony Vickers and Olive resumed their journey to Los Angeles by plane and lived in her apartment. During the next five months, they lived together as man and wife, and introduced each other as such. In May, 1943, because of Olive's ill health, they went to Texas. Deciding to stay there, Vickers secured part-time employment at electrical work and in a cigar stand. Early in July, they received word that property located in Los Angeles, title to which stood in the name of Olive, was about to be sold. They returned to Los Angeles and Olive died there on July 29th.

A few days later, Vickers filed a petition for special letters of administration "In the Matter of the Estate of Olive Agnes Vickers, also known as Olive Agnes Kirk." In this petition Vickers alleged that he was the husband of the decedent. At the same time, he petitioned for letters of administration. The petition for special letters was granted immediately, but before the date set for the hearing of the application for letters of administration, a creditor of the decedent petitioned for revocation of the special letters which had been granted. In this petition, it was alleged that these letters had been granted to Vickers upon "the stated ground of necessity to enable him to pay decedent's funeral and interment expenses" but that he "made no move to have the body taken care of" and decedent's mother "was forced to pay the expenses of funeral services and interment." Upon a hearing, the special letters were revoked and the decedent's mother was appointed administratrix of the estate.

In his testimony before the committee, Vickers gave two reasons for making application for special letters of administration. First, he said, he was without funds, and burial expenses amounting to approximately $352 could not be paid unless he obtained the money from the estate. His second reason was that because of the death of Olive, the escrow for the sale of her property could not be completed. The holder of a second trust deed then threatened to foreclose, and special letters were applied for in order to complete the escrow and save the equity in the property.

The State Bar charges that, in making application for special letters of administration, Vickers intentionally misled the court as to the true facts by representing that he was the husband of the decedent. At that time, it is alleged, Vickers knew, or should have known, that such a statement was untrue. Other allegations are that the same statement was included in his petition for letters of administration and each of them was made ''for the sole purpose of obtaining letters of administration of an estate in which you had no legal interest or right thereto as an heir at law or otherwise, nor any legal right to apply for such letters.''

According to the probate judge who granted the petition for special letters of administration, Vickers stated to him that the decedent was his wife. The representations in regard to the nature of the property owned by the decedent, and its value, were substantially the same as those made in the petition. When he made the order, he had no knowledge of the prior marriage to Georgia nor of the divorce proceedings. At that time, the judge told the committee, ''he appeared as any reasonable person would have appeared under the same circumstances, having recently experienced a death in his immediate family, . . . he seemed to be upset and disturbed mentally.''

As justifying his representations to the probate court, Vickers told the committee that when Olive died he was without funds and had to borrow money for her burial expenses; the purpose of the proceeding was to obtain money to finance the funeral and purchase a grave. And following the issuance of special letters of administration to him, he told the attorney for the mother of the deceased that as he was going into the Army he could not act as administrator; he was not interested in the estate beyond providing money for funeral expenses, and would be satisfied to allow the mother and her attorney to make a fair distribution of the property. The estate to be administered upon was in part his separate property, he claimed, but to avoid a deficiency judgment on record against him, he had Olive Kirk take title to the home, in which there was about an $800 equity, in her maiden name. According to this testimony, Vickers received only $16 from the estate.

Joseph Musgrove, the attorney for the mother, testifying for The State Bar, told the committee that he had obtained the revocation of Vickers' letters, and then had the mother appointed as administratrix. In discussing the matter with him, said Musgrove, the explanation made by Vickers for his conduct was that ''she wanted to be married and to please her

I did go through with the ceremony.'' But Vickers added, ''I also had it annulled.'' Further, Musgrove quoted Vickers as saying, ''for the purpose of administering the estate I think this ceremony that we went through in Texas will be sufficient to qualify me as her husband even though the marriage wasn't valid.''

Manuel Ruiz, Jr., licensed to practice in California and also in Mexico, testified on behalf of The State Bar, that at the time in question, there was merely a one-day residential requirement for a divorce proceeding, and after the suit was commenced, unless the action was contested, the plaintiff did not have to return; all necessary appearances could be made by counsel. However, he added, where the defendant did not contest or raise an issue, the shortest time within which a default could be entered under the circumstances related by Vickers was about 18 days from the date of filing the complaint. Moreover, entry of default, he said, was a prerequisite to the pronouncing of judgment and the issuance of a decree.

Upon this evidence the local committee found that the allegation of Vickers in the petitions for letters of administration concerning his marital relationship to Olive Agnes Vickers ''was false and untrue and was known by the respondent to be false and untrue and was made for the purpose of deceiving the judge of the Superior Court before whom . . . [those petitions] would be heard, and the judge before whom the petition for special letters of administration was heard was deceived by said allegation.'' The finding in regard to the charge that Vickers had made false representations to a client is in favor of the petitioner. As to the last count, the committee determined that a client of Vickers loaned him a typewriter, reasonably worth $56, which he sold for $30 without accounting for the proceeds, notwithstanding a demand from the client.

The committee's conclusions of law from these findings were that in making the representations to the court in the probate matter and in selling the typewriter without paying its reasonable value, Vickers committed acts of moral turpitude, and violated his oath and duties as an attorney at law; also, the committee concluded, he commingled his property with that of a client. As discipline, the committee recommended that on count one Vickers be disbarred; that count two be dismissed; and on count three, that he be suspended for a period of six months. Except for two inconsequential changes, the

findings of the local administrative committee were adopted by the Board of Governors, which recommended that the petitioner be disbarred. In fixing the degree of discipline, the Board of Governors took into consideration the suspension of Vickers for two years on account of professional misconduct, ordered by this court on July 5, 1944 (Bar Misc. 1808).

The petitioner contends that the evidence is insufficient to support the findings of the Board of Governors. In defense of his representations to the court in the probate matter, he argues that as he went through a marriage ceremony with Olive Kirk in Texas, he was her husband, and his status as such could be affected only by an annulment of the marriage; no annulment ever was had, hence, in law, he was the husband of Olive Kirk at the time of her death. Moreover, Vickers says, his action did not involve professional misconduct as such, but related only to his private life. As to the other charge, he asserts that Guthrie, the client who left the typewriter with him, solicited and received considerable legal advice without paying for it, and is "a skilled and congenital cheating chisler." Under these circumstances, Vickers contends, the penalty recommended by the Board of Governors was much too severe. But in any event, he concludes, the board erred in taking into consideration his two-year suspension from the practice of law for professional misconduct. In support of its action, The State Bar contends that there is no deficiency in the evidence as to either offense, that the punishment recommended is justified, and that in fixing discipline a prior suspension may be considered.

Section 6103 of the Business and Professions Code provides as to an attorney that "any violation of the oath taken by him, or of his duties as such attorney, constitute causes for disbarment or suspension." By section 6068, subsection (d) of that code, it is stated that, "It is the duty of an attorney to . . . never seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." In the same code it is further provided that an attorney may be disbarred for "[t]he commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relation as an attorney or otherwise, and whether the act is a felony or misdemeanor or not. (§ 6106.)

██ Vickers' commission of the acts of professional misconduct charged in count one of the order to show cause depends first upon whether his representation to the probate

court was in fact untrue, and secondly, whether he knew that his statement was false and he intended thereby to deceive the court. In this latter connection the recently stated rule is that "[t]he presentation to a court of a statement of fact known to be false presumes an intent to secure a determination based upon it and is a clear violation of the quoted provision [§ 6068, subsec. (d)]. . . . The conduct denounced by the Business and Professions Code is not the act of an attorney by which he successfully misleads the court, but the presentation of fact, known by him to be false, which tends to do so" (*Pickering* v. *State Bar*, 24 Cal.2d 141, 144-145 [148 P.2d 1]).

After the matter was argued before this court, it was "referred to the Board of Governors of The State Bar with instructions to take further evidence with respect to the circumstances surrounding petitioner's divorce allegedly obtained in the State of Chihuahua, Mexico, from Georgia Vickers, and his good faith in subsequently representing to the probate court his marital relationship to Olive Agnes Vickers." In the later proceedings, Vickers stated to the committee that at the time of making application for special letters of administration, he believed he was the legal surviving husband of Olive. In explanation of his belief, Vickers said that Cocke "had me sign a register, and told me that was all that was sufficient. That you only had to have one day's lapse and you were entitled to your divorce."

This is in direct conflict with Cocke's version of the conversation. The attorney summarized his statements to Vickers as follows: "I told Mr. Vickers that service of summons on his wife in the absence of waiver was absolutely essential to legality . . . that approximately not less than twenty-one days would have to elapse from the date of service before the decree could issue . . . [and] four to six weeks, usually five weeks, would have to elapse from the date of registration before the decree could issue, even in the absence of contest. . . . I advised him, of course, that the summons would have to be served after the action was filed but before any decree could issue." To be noted in this connection is Vickers' statement at the first hearing before the committee in regard to Cocke's explanation of the law. Vickers then testified: "He did say that in order to effect the validity of [the decree of divorce] . . . as far as the United States is concerned that they were going to serve notice upon [Georgia]. . . ."

In relating his explanation to Vickers concerning the Mexican law, Cocke said, "I did not tell Mr. Vickers that the whole proceeding 'was all over,' and he had secured a divorce from Georgia Josephine Moore Vickers. I probably did tell him that his preliminary steps had all been taken and I would not need him further unless a contest arose."

This accords with the record, which shows that three days later, which was after the marriage ceremony with Olive, a complaint was filed in the Civil Court of First Instance at Juarez whereby Vickers commenced an action for divorce against Georgia. A week later, at Los Angeles, she was served with a copy of the summons and complaint, but no further proceedings have been had. As stated by Cocke, this was "because Mr. Vickers never put me in a financial position to make the final tax payment which was a condition precedent to securing the divorce decree. I heard nothing from Mr. Vickers, notwithstanding I wrote him several letters."

Following the presentation of evidence, the committee made supplemental findings of fact. It found that Vickers went to the office of the mayor of Juarez and affixed his signature to a certificate of registration, thereby becoming eligible to commence a proceeding for divorce. But that registration, as Vickers then well knew, had no other force or effect. Other findings are that at the time of Vickers' purported marriage to Olive, he "knew and was well aware that the same was of no legal force or effect . . .; and further, knew and was well aware that he was not divorced from Georgia. . . ."

Upon consideration of the evidence, the findings formerly made were affirmed and the issue of the good faith of Vickers' representation to the court was determined adversely to him. Vickers knew or should have known, the committee found, that the allegation of his petitions to the probate court concerning his relationship to Olive was false and untrue. That representation, the committee further found, was made with the object of intentionally misleading the court as to the true facts "and for the sole purpose of obtaining letters of administration of an estate in which . . . [he] had no legal interest or right whatsoever, nor any legal right to apply for such letters." From these facts, the committee concluded in the same form as its original recommendation, that Vickers violated his oath and duties as an attorney at law within the

meaning of the Business and Professions Code, and again recommended that he be disbarred from the practice of law.

When the supplemental proceeding reached the Board of Governors, Vickers made a motion for a hearing de novo. The motion was denied but he was allowed to present certain additional evidence. He testified to substantially the same facts as he had stated to the committee and asserted that he "honestly believed" he had done everything necessary to obtain a Mexican divorce. He also declared that at the time of his appearance in the probate court he not only "honestly believed" that Olive was his wife, but still has that belief. "I was absolutely acting in good faith in obtaining the Letters of Special Administration . . . [T]here was no doubt in my mind; my only purpose was to see that she got a decent burial."

Other testimony of Vickers was that he did not secure the marriage license in El Paso in the belief that his previous marriage had been dissolved. "I knew I had a year to wait on the California action," he explained. But, according to his belief, he insisted, the Juarez action resulted in his being free to marry notwithstanding the fact that in California the decree of divorce was not final.

The interlocutory decree of divorce obtained by Georgia could not have become final before September 2, 1943. This was over nine months after the marriage ceremony in El Paso and also after the time of filing the petitions for letters of administration. It is elementary that an interlocutory decree of divorce does not dissolve the union. The parties continue to be husband and wife until the entry of a final decree after the lapse of one year. (Civ. Code, § 61, subsec. 1, and § 132.) There is no substance whatever to the assertion of Vickers that by virtue of the Texas ceremony he was technically the "husband" of Olive under a voidable marriage. At all times shown by this record he was the husband of Georgia and by the terms of section 61 of the Civil Code, his purported marriage to Olive not only was "illegal and void from the beginning" but subject to collateral attack at any time. (*Estate of Elliott,* 165 Cal. 339 [132 P. 439].)

Vickers has had a legal education and some experience in divorce litigation. His marital status at the time of the marriage ceremony with Olive and when she died primarily depended upon the status of his marriage to Georgia.

He admits knowledge of all of the essential facts of the proceeding brought by Georgia, and considering all of the circumstances surrounding his acts with Olive in El Paso, the findings of fact and conclusions of law made by the administrative committee, and adopted with minor changes only by the Board of Governors, are fully justified by the evidence.

It is argued that, at the worst, Vickers was in the position of a putative or de facto spouse, and for that reason had a standing in court in matters relating to property. But his argument begs the question, for the principal issue in the present case is whether or not he acted in good faith in representing that he was the surviving husband of Olive. He relies upon *Schneider* v. *Schneider,* 183 Cal. 335 [191 P. 533, 11 A.L.R. 1386], and *Coats* v. *Coats,* 160 Cal. 671 [118 P. 441, 36 L.R.A.N.S. 844], but in these cases the parties who entered into the marriage acted in good faith and honest belief in their right to do so.

Concerning the complaint of Vickers as to the severity of the discipline recommended, the representation to a court of a fact known by an attorney to be false is a serious matter, particularly when that fact relates to his own affairs and is the basis for an order by which he obtains financial advantage. Vickers has been under suspension as discipline imposed in two proceedings brought upon four different complaints against him, and the record of his prior misconduct was properly considered by the Board of Governors in reaching a determination as to the discipline to be recommended upon the present charge. (*Herron* v. *State Bar,* 24 Cal.2d 53 [147 P.2d 543] ; *McGregor* v. *State Bar,* 24 Cal.2d 283 [148 P.2d 865] ; *Prime* v. *State Bar,* 18 Cal.2d 56 [112 P.2d 881].) However, the recommendation by the Board of Governors in the present proceeding will be modified, and it is ordered that the petitioner be suspended from the practice of law for a period of three years commencing 30 days after the date of the filing of this opinion.

CARTER, J.—I dissent.

The sole basis for the judgment of suspension in this case is a claimed knowingly false representation by petitioner to the probate court that he was the husband of Olive Agnes Vickers, deceased, in a proceeding for special letters of administration on her estate. Not only is the result based upon the

wholly *private* conduct of petitioner unconnected with his capacity as an attorney of law but the alleged misrepresentation was of a purely technical import and was clearly not intended to cause injury to anyone. Any other conclusion finds no substantial support in the evidence.

The judgment of suspension is based upon the finding that petitioner knowingly misrepresented his marital status to the court in his petition as above mentioned. That alleged falsity must turn upon the assumption that petitioner's marriage to Olive was invalid, which in turn depends upon the legality of the proceedings for a divorce in Mexico. It should be noted that while no divorce was ever granted by the Mexican court, proceedings therefor were commenced. Whether or not the proceedings there taken, together with all the other circumstances, were sufficient to make petitioner's claim that he was Olive's husband, in bad faith, is the question presented. It should first be observed in this connection that the legal question as to the legality of Mexican divorces is difficult and involved. Mexican divorces have been held valid (*Commonwealth* v. *Yarnell,* 313 Penn. 244 [169 A. 370]). And also invalid (*Bethune* v. *Bethune,* 192 Ark. 811 [94 S.W.2d 1043, 105 A.L.R. 814]; *Garman* v. *Garman,* 102 F.2d 272 [70 App.D.C. 4]; *Bergeron* v. *Bergeron,* 287 Mass. 524 [192 N.E. 86]; *May* v. *May,* 251 App.Div.. 63 [295 N.Y.S. 599]; *Estate of McNutt,* 36 Cal.App.2d 542 [98 P.2d 253]; *duQuesnay* v. *Henderson,* 24 Cal.App.2d 11 [74 P.2d 294]; *Kegley* v. *Kegley,* 16 Cal.App.2d 216 [60 P.2d 482]; *People* v. *Harlow,* 9 Cal.App.2d 643 [50 P.2d 1052]; 105 A.L.R. 817). There may be an estoppel to question the validity of the foreign decree. (*Bruguiere* v. *Bruguiere,* 172 Cal. 199 [155 P. 988, Ann.Cas. 1917E, 122]; *Kelsey* v. *Miller,* 203 Cal. 61 [263 P. 200].) In an article on Mexican marriages and divorces by William B. Stern, Foreign Law Librarian of the Los Angeles County Law Library, appearing in the March-April, 1945, edition of The State Bar Journal, the following statement appears:

"It would be beyond the scope of this article to point out details in which the codes of the several states differ from the Old or the New Federal Civil Codes, or from both of these codes. But I would like to emphasize the need of consulting the codes and laws of each particular state whose law forms the basis of a controversial marriage or divorce. Such a search of the law should not only comprise the

normative rules of the laws, but should also embrace statutory provisions by which dispensatory faculties are conferred on judicial and administrative authorities; many marriages and divorces which at first glance seem to be defective, actually derive their validity from dispensations and waivers.''

So far as the record in this case discloses, no judicial tribunal has passed upon the validity of petitioner's marriage to Olive Agnes Vickers. The petition for revocation of the special letters of administration issued to petitioner alleged that petitioner was not married to Olive, but other grounds were advanced, and it does not appear upon which ground the order of revocation was granted. It is not claimed that the marriage was not legally consummated according to the law of Texas where it was solemnized. The sole claim of invalidity is predicated upon the assumption that petitioner's marriage to Georgia Vickers had not been dissolved at the time his marriage to Olive was consummated, giving consideration to the point to which the proceedings had developed and the effect thereof. This presented a legal question which could only be determined by a judicial tribunal in an appropriate proceeding after obtaining jurisdiction over the parties and the subject matter.

It clearly appears from the record in this case that the charge against petitioner is based upon the conclusion reached by The State Bar that petitioner was guilty of unprofessional conduct involving moral turpitude because he made an alleged misrepresentation relative to his marital status. In my opinion it is not the function of The State Bar to pass upon the validity of the marital status of members of the bar, or predicate a charge of moral turpitude against a member of the bar upon representations made by him in good faith with respect to his marital status, especially in a case such as this where the record shows that the validity of petitioner's marriage to the deceased was dependent upon the validity of divorce proceedings which petitioner claims he instituted in Mexico where he says he was advised by legal counsel that such decree was valid and legal and resulted in the permanent dissolution of his former marriage. Even conceding that a judicial tribunal might determine such proceedings to be insufficient to sever the bonds of matrimony in an appropriate proceeding to test their validity, it would not necessarily follow that a member

of the bar would be guilty of moral turpitude in making a representation in good faith that such proceedings were effective before they had been adjudged invalid by a judicial tribunal having jurisdiction to pass upon their validity. Many cases have been decided by the courts of last resort of several of our states and by the Supreme Court of the United States involving questions of this character and we find these courts divided on the question of whether or not divorce proceedings consummated in certain states were effective to dissolve the marriages which were the subject of such proceedings. The following citations reflect the wide divergence of judicial opinion which has existed and apparently still exists on this subject. (*Sherrer* v. *Sherrer,* 334 U.S. 343 [68 S.Ct. 1087, 92 L.Ed. —] ; *Coe* v. *Coe,* 334 U.S. 378 [68 S.Ct. 1094, 92 L.Ed. —] ; *Estin* v. *Estin,* 334 U.S. 541 [68 S.Ct. 1213, 92 L.Ed —] ; *Kreiger* v. *Kreiger,* 334 U.S. 555 [68 S.Ct. 1221, 92 L.Ed. —] ; *Williams* v. *State of North Carolina,* 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366] ; *Esenwein* v. *Commonwealth (Esenwein* v. *Esenwein*), 325 U.S. 279 [65 S.Ct. 1118, 89 L.Ed. 1608, 157 A.L.R. 1396] ; *Williams* v. *State of North Carolina,* 317 U.S. 287 [63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273] ; *Haddock* v. *Haddock,* 201 U.S. 562 [26 S.Ct. 525, 50 L.Ed. 867] ; *Andrews* v. *Andrews,* 188 U.S. 14, 5 to 3 [23 S.Ct. 237, 47 L.Ed. 366] ; *Atherton* v. *Atherton,* 181 U.S. 155 [21 S.Ct. 544, 45 L.Ed. 794] ; *Bell* v. *Bell,* 181 U.S. 175 [21 S.Ct. 551, 45 L.Ed. 804] ; *Olds* v. *Olds,* 219 Iowa 1395 [260 N.W. 1, 5 to 4, 261 N.W. 488] ; *Golden* v. *Golden,* 41 N.M. 356 [68 P.2d 928, 3 to 2], and 17 Am.Jur., Divorce & Separation, § 747.)

In the concurring opinion of Mr. Justice Douglas in the Esenwein case he made the very pertinent observation that ''The question of marital capacity will often raise an irreconcilable conflict between the policies of the two States.''

In view of the great conflict of judicial opinion as to the jurisdictional requirements necessary to consummate a valid divorce proceeding it is not possible for me to see how a charge of unprofessional conduct can be predicated upon a representation made in good faith by a member of the bar relative to his marital status where such member of the bar launches proceedings to obtain a divorce in accordance with the law of a state or foreign country before consummating the marriage in question. In other words, in view of the conflict of judicial opinion on the difficult and com-

plex problems involved in the determination of the validity of the marital status, it seems to me that it is expecting too much of a lowly member of the bar to be absolutely certain of his marital status under the circumstances here presented.

It is my understanding that under recent decisions of the United States Supreme Court, the courts of one state are not required to give full faith and credit to a divorce decree obtained in another state where jurisdictional requirements have not been met (*Williams* v. *State of North Carolina*, 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366] ; *Esenwein* v. *Commonwealth*, 325 U.S. 279 [65 S.Ct. 1118, 89 L.Ed. 1608, 157 A.L.R. 1396]), and parties who remarry after obtaining such a decree may be adjudged guilty of bigamy. There are no doubt many cases of this character where no prosecution will ever be instituted because of inaction of the prosecuting officials or where both parties to the invalid divorce decree have remarried. Nevertheless, the crime of bigamy has been committed in such cases, and if a lawyer is involved, he is subject to disbarment because the crime of bigamy certainly involves moral turpitude. If the majority opinion in this case is permitted to stand, then The State Bar may successfully proceed with disbarment proceedings against every member of the bar of this state who has remarried after his former marriage was presumably dissolved by a decree of divorce which is subject to a jurisdictional infirmity without a prior determination of its invalidity by a judicial tribunal of competent jurisdiction. In other words, The State Bar will be permitted to perform the functions of both our criminal and civil courts in addition to its function as an administrative agency. This was never contemplated by even the most ardent supporters of the State Bar Act.

The asserted disability relied upon in order to disqualify Vickers from entering into a marriage with the decedent was that he had not complied with the procedural requirements necessary in order to obtain a divorce in Mexico. To hold that Vickers knew the falsity of the allegation in his petition for special letters of administration that he was the husband of the deceased, and that he made the representation with the intent to deceive, is quite different from a determination as to what his actual marital status may have been after the Mexican divorce proceeding and the Texas marriage ceremony, and is unsupported by any evi-

dence in the entire record. The majority opinion apparently upholds the finding referred to upon the slim basis of what Cocke, petitioner's attorney in the Mexican divorce proceedings, said he told petitioner. Plainly petitioner did not understand it in that fashion, otherwise it is not to be supposed that he would have married Olive thereafter and commit the crime of bigamy. On the contrary the presumption is, in accordance with his testimony, that he believed the marriage was severed, that he acted innocently and did not violate the law.

It is well settled in this state that when a marriage has been shown in evidence the law raises a strong presumption of its legality. (*In re Pusey*, 173 Cal. 141 [159 P. 433]; *Hunter* v. *Hunter*, 111 Cal. 261, 267 [43 P. 756, 52 Am.St. Rep. 180, 31 L.R.A. 411]; *Estate of Newman*, 34 Cal.App.2d 706, 710 [94 P.2d 356].) There is also a presumption that a person is innocent of crime or wrong. (See, Code Civ. Proc., § 1963(1); *Estate of Newman, supra.*) (If Vickers did not obtain a divorce in Mexico his marriage to the decedent was bigamous.) It is obvious that these presumptions have not been dispelled in this case. Certainly, it was to Vickers' advantage to complete the Mexican divorce proceeding as there would have been no object in going to the trouble and expense of hiring a lawyer and instituting a proceeding if he had no intention of pursuing the matter to completion. The good faith of Vickers in the premises is shown by the fact that he lived with the deceased, outwardly manifesting himself as her husband during the entire remainder of her life. Although she had a mother and brother living, it was he who was endeavoring to make the arrangements for her funeral and burial and see that the expenses thereof were paid. It was for that latter purpose, primarily, that he petitioned for special letters of administration.

The testimony of Vickers cannot be made the basis of an inference that he knew he had not obtained a divorce in Mexico. An inference is a conclusion as to the existence of a material fact that may properly be drawn from the existence of certain primary facts. (See, Code Civ. Proc., §§ 1832, 1958.) Whether a particular inference can be drawn from certain evidence is a question of law and depends upon its reasonableness. (See, Code Civ. Proc., § 1960.) The majority opinion points to no primary facts

testified to by Vickers from which it can reasonably be inferred that he knew the Chihuahua court had no jurisdiction to enter or did not enter a divorce decree prior to the marriage ceremony in El Paso. On the other hand, quite to the contrary, Vickers' testimony reveals the following: His attorney told him that it took six months to get a divorce in the State of Baja California; 30 days in Sonora, and by virtue of special treaty with the State of Chihuahua, a divorce could be obtained there in one day. When in Juarez, Chihuahua, he appeared in court before a judge and signed an official "document roll." While returning to El Paso his attorney told him it "was all over" and that he had a divorce. He was told that it was not essential to the validity of the divorce in Chihuahua that the defendant be notified, because under the laws of Chihuahua the opposing party could not contest the grounds for divorce; that the fact of the filing of a complaint is taken to show dissatisfaction and incompatability, and the divorce is automatically rendered. He was further informed that notice would be sent to the county of the residence of the defendant for personal service upon her, in accordance with the general practice carried on in order to satisfy the comity requirements of some of the adjoining states. Also, that this notice, when returned, would be filed in the divorce action *nunc pro tunc*. His testimony further reveals that he informed the court of the residence address where the defendant could be found and served.

Furthermore, under the facts of this case, Vickers' state of mind at the time he went through the marriage ceremony in El Paso has no bearing upon what he knew at the time he filed his petition for special letters in the estate of Olive Agnes Vickers. In other words, even if it were possible to infer from Vickers' testimony concerning the notice or waiver that was to be sent or obtained from his first wife, that he must have known that no divorce decree had been entered prior to the El Paso marriage ceremony, this furnishes no support for the charge in this proceeding that he knew that he was not the husband of the deceased eight months later when he filed his petition in the probate court. This for the reason that Vickers was also told that this waiver or notice would be entered *nunc pro tunc*. The question is not whether this actually could or could not confer jurisdiction upon the court to render a divorce decree at or

prior to the time of the marriage ceremony with the deceased (assuming such notice or waiver to be necessary), but whether such fact furnished a reasonable basis for Vickers to believe that it could. In view of the further fact that his wife could not contest the divorce suit, even if she wanted to, it appears to have been most reasonable for him to so believe.

The contention that Vickers knew Mexican legal procedure gains no support from the facts of his education and experience. At the time of the events here concerned he was 33 years of age. His legal experience was quite limited. He had been a member of The State Bar less than four years and had not practiced elsewhere. It need scarcely be said that the modes and methods of civil procedure in Mexico are not matters of common knowledge to the bar of this state. Respondent proved what it claimed to be the law of Chihuahua, Mexico, at the time in question by a member of the bar of that place, qualified as an expert upon divorce law. Moreover, Vickers did not represent himself in the Mexican proceeding, but engaged an attorney licensed to practice in Chihuahua, Mexico.

I further am unable to subscribe to the majority opinion for the reason that it characterizes the acts charged in count one of the order to show cause as ''professional misconduct.'' Vickers did not appear before the probate court in his capacity as an attorney, but appeared in his personal capacity and so advised the court. He did not even prepare the petition, but another attorney, whose name appears thereon, did so for him. If by the citation of Business and Professions Code, section 6106, the majority mean to imply that Vickers was guilty of ''moral turpitude, dishonesty, or corruption,'' then the opinion is further erroneous for the reason that there was no attempt at personal gain. Vickers obtained the appointment as special administrator for legitimate reasons within the purview of the Probate Code provisions for such appointment. He was in need of funds to provide a funeral and decent burial for the one with whom he had been living, ostensibly, and in good faith as his wife. Immediate action was also necessitated in order to consummate a sale of real property that had belonged to the deceased and petitioner before such sale was rendered impossible by virtue of foreclosure proceedings then under way. A special administrator is an emergency officer, appointed

where necessary, not to conduct administration or distribution of the estate, but solely to conserve the property. (11B Cal.Jur. 864.) He was required to post a $2,000 surety bond as a condition precedent to be appointed special administrator, and it does not appear that any claim has ever been made against the surety on account of maladministration by Vickers nor has it been shown in this proceeding that any detriment was caused to the estate by his appointment.

It appears that the petition for special letters of administration was filed six days after the death of ·Olive Agnes Vickers, claimed by petitioner to be his wife, and at a time when he had but 25 cents to his name. One's qualifications to discharge whatever trust may be reposed in him by virtue of his profession or general occupation should not be judged too strictly by what he does at such a dismal hour and under stress of such circumstances. Under any view of the facts in this proceeding nothing is shown that is deserving of any further discipline than that which the petioner is now undergoing.

In conclusion, I deem it appropriate to quote from the opinion of the District Court of Appeal in the case of *In re Kling,* 44 Cal.App. 267, at page 271 [186 P. 152], where the court speaking through Mr. Justice Victor E. Shaw said: "The record, as we read it fails to disclose any deception on the part of appellant, or that he acted through corrupt motives or otherwise violated the provisions of section 282 of the Code of Civil Procedure. The oath required by section 278 of the Code of Civil Procedure of any attorney is that he will 'faithfully discharge the duties of an attorney and counselor at law to the best of his knowledge and ability.' *Moral turpitude cannot be predicated upon errors of judgment as to the law,* or action had and taken in good faith by an attorney, openly and with notice to the adverse party under an honest assertion of legal right, where there is no deception practiced or unfair advantage sought." (Italics added.)

In my opinion the proceeding against the petitioner should be dismissed.