OPINION. TURNER, Judge: The first issue raised in the proceedings is whether the payments which the 4 corporations, Richard, Whittier, Rex, and Lawrence, made to San Gabriel were properly included by such corporations in computing the cost of the houses which they constructed and sold. The respondent determined that the amounts paid to San Gabriel were not properly includible by the corporations in computing their cost of goods sold because all such payments were repayable. Petitioners, on the other hand, argue that the liability of each of the corporations to pay for the installation of the water facilities was fixed and absolute; and that despite whatever possibility there was of a repayment of part or all of the amounts paid, the payments were nonetheless properly includible in computing the cost of the houses sold. In Colony, Inc., 26 T. C. 30, we had much the same question as here.[6] There the corporate taxpayer, which was engaged in the business of subdividing tracts of land and selling lots, made payments to utility companies for the installation of gas and electric service under contracts which called for the repayment of the amounts paid, such repayments to be made by payment of a specified amount for each new customer who purchased service from the gas company’s mains or connected to the electric company’s lines. The repayments were to be made only for a period of either 5 or 10 years from the date of the contract. The Commissioner took the position that the taxpayer was not entitled to include any part of the payments so made to the utility companies as a part of the cost of the lots which it sold during the taxable years, because of the possibility that all or a part of such payments might be repaid. We concluded that the determining factor was that the taxpayer had made unconditional payments to the utility companies in order to obtain service from them for the purchasers of its lots. We held that the payments were thus closely related to the sale of the lots and that the taxpayer’s income from such sales would be more clearly reflected if a pro rata portion of the payments which it made to the utility companies was included in its basis for determining the gain or loss on each lot sold. We see no distinguishing difference in that case and the one before us here. It is true that there the repayments were measured by a fixed sum to be paid for each new customer who purchased service from the utility companies, while here the payments depended upon the amount of water sold by San Gabriel in the various subdivisions. But in both cases the controlling facts were that the corporations made unconditional payments to provide utility service for the subdivisions, and such payments were directly related to the property sold. We therefore conclude that the payments which the 4 corporations here made were a proper item to be included in computing the cost of the property which they sold. The second issue is whether each of the water contracts which petitioners Albert Gersten, Milton Gersten, and Myron P. Beck received from the corporations upon their dissolution had a fair market value at that time. The individual petitioners did not report any value for such contracts in computing the amount of gain realized by them upon the distribution of corporate assets. The respondent determined that each contract had a fair market value, and accordingly increased the amount of gain reported by the individual petitioners from the distribution of such assets to them. The petitioners contend that the contracts had no ascertainable fair market value at the time the corporations were dissolved, and citing Burnet v. Logan, 283 U. S. 404; Westover v. Smith, 173 F. 2d 90; and Commissioner v. Carter, 170 F. 2d 911, affirming 9 T. C. 364, argue that the distribution in liquidation did not as to those contracts result in closed transactions and, as a consequence, that no amounts were to be attributed to the contracts at the times of liquidation, but that the payments from San Gabriel subsequent to the dissolutions were to be reported as capital gains as received. The evidence shows that each of the contracts did have a fair market value at the time the corporations were dissolved, and we have so found. None of the contracts were as much as 3 years old at the time of distribution, and the payments under them had commenced' on all except the Lawrence contract. They began on that one shortly thereafter. All houses had been completed and sold by the time each corporation dissolved. Expert witnesses testified that contracts, similar to those here, were bought and sold, and that one might expect to receive as much as 70 per cent of the total original payment on such similar contracts. There was testimony to the effect that a proposed freeway would cross the subdivision developed by Lawrence. No showing, however, was made that the plans for the freeway route were final, or, if adopted, the extent to which the occupancy of the houses within the area would be affected during the repayment period. Neither was there any showing that petitioners would or would not have a claim for compensation, if and when their rights to repayment might be destroyed as a result of the building of the freeway. The record, in our opinion, amply sustains the respondent in his determination of fair market value, and we have so found in our Findings of Fact. In Westover v. Smith, supra, and Commissioner v. Carter, supra, the facts were that contractual rights received upon the dissolution of the corporation had no ascertainable fair market value. Here the facts are otherwise. See Pat O'Brien, 25 T. C. 376. The third issue is as to the deductibility of $4,721.60 paid by Albert Gersten in 1949, in satisfaction of Federal tax liabilities of Homes Beautiful, Inc., a dissolved corporation, of which he had owned 50 per cent of the capital stock and had received 50 per cent of the assets in liquidation. The remainder of the stock had been owned by Theodore Robbins, who likewise had received 50 per cent of the assets of the corporation upon liquidation. The payment of $4,721.60 represented a final payment by Gersten, as transferee, of tax and interest owing by Homes Beautiful, Inc. He had previously paid $40,000 in 1947, and presumably had not been reimbursed by Robbins for any part thereof. It is stipulated that Robbins was insolvent at the time of the final payment in 1949. On the joint return filed by Albert and Lucille Gersten for 1949, they deducted the above $4,721.60 in full. The respondent in his determination treated the payment as having been made by Gersten, one-half for his own account and the remainder for the account of Robbins. He further determined that the $2,360.80 treated as having been paid on behalf of Robbins was a nonbusiness bad debt, deductible as a short-term capital loss under section 23 (k) (4) of the Internal Revenue Code of 1939. Of the $2,360.80 treated as having been paid by Gersten on his own behalf, he allowed in full the deduction of $630.57, as representing one-half of the amount which was interest. The remaining $1,730.23 was determined to have been a long-term capital loss under the provisions of section 117 and subject, for deduction purposes, to the limitations of that section. Taking the position that Robbins had contributed no amount to the tax payments made as transferee of Homes Beautiful, Inc., and relying on Fox v. Commissioner, 190 F. 2d 101, reversing 14 T. C. 1160, and Pollak v. Commissioner, 209 F. 2d 57, reversing 20 T. C. 376, it is the petitioner’s contention that as a guarantor he had been called upon to pay the principal obligation of an insolvent debtor, and that the resulting loss, under the cases cited, was a loss incurred in a transaction entered into for profit, within the meaning of section 23 (e) (2), and as such, was deductible in full. On brief, the respondent now takes the position that the entire $4,721.00 is to be regarded as having been paid by Gersten for his own account, that $1,261.13 of the amount paid was interest, deductible by Gersten in full, and under Arrowsmith v. Commissioner, 344 U. S. 47, the remaining $3,460.47 was a long-term capital loss, which, for purposes of deduction, is subject to the limitations thereon. That the Fox and Poliak cases do not represent sound law has recently been settled by the Supreme Court in Putnam v. Commissioner, 352 U. S. 82, and it follows that petitioner’s claim that the loss sustained upon the payment in 1949 was a loss incurred in a transaction entered into for profit under section 23 (e) (2) is not well taken. It also follows, from the pronouncements of the Supreme Court in the Putnam case, that such portion of the payment as was made by Gersten on behalf of Robbins, and for which he had a claim against Robbins, was a nonbusiness bad debt, deductible as a short-term capital loss under section 23 (k) (4). As to that portion of the payment which represented a satisfaction of Gersten’s own liability as transferee of Homes Beautiful, Inc., Arrowsmith v. Commissioner, supra, is controlling, and the loss sustained was a long-term capital loss. Whether or not the 1949 payment was in total amount a payment on Robbins’s behalf, as petitioner contended in seeking application of section 23 (e) (2), or represented payments on behalf of both Gersten and Robbins in equal amounts, as the respondent determined, presents a question more difficult of solution. We are not advised as to the circumstances relating to the payment of the $40,000 in 1947. The record does not show whether it was made by Gersten with or without some understanding between him and Robbins. We are only advised that he paid the full $40,000 in 1947, and that at the time of making the final payment in 1949, Robbins was insolvent. The record being as it is, we have found no sound basis for disturbing the respondent’s determination herein, under which he treated one-half of the $4,721.60 as having been paid by Gersten for his own account and the other half on account of Robbins. The respondent’s determination is accordingly sustained. The fourth issue is whether petitioner Albert Gersten, and Bernice Anne Gersten, whom he married at Juarez, Mexico, in 1950, were entitled to file a j oint income tax return for such year. The respondent has determined that Albert Gersten was not legally married to Bernice Anne Gersten during 1950 and that they therefore were not entitled to file a joint return as husband and wife, as permitted by section 51 (b) of the 1939 Code.[7] Albert Gersten contends, first of all, that the respondent has neither the function nor the right to challenge the validity of the marriage relationship. We think that argument without merit. Section 51 (b) provides that a husband and wife may make a single return jointly. Obviously, the respondent has not only the right but the duty of determining whether a man and woman who file a joint return are, in fact, legally married and entitled to file such a return under the provisions of the statute. This was made clear in Marriner S. Eecles, 19 T. C. 1049, affd. 208 F. 2d 796; and Commissioner v. Ostler, 237 F. 2d 501, affirming T. C. Memo. 1955-207. We said, in Marriner S. Eccles, supra, that marriage, its existence, and dissolution, is particularly within the province of the States. Hence, we look to the law of the State of California, the residence and domicile of both Albert Gersten and of Bernice Anne Gersten, to determine if a valid marriage existed between them on December 31,1950. Albert Gersten has shown that his second marriage in Mexico was formally solemnized. Under California law, upon such a showing, a second marriage is presumed legal and the former marriage is presumed dissolved. Such presumption, however, is overcome by evidence showing that the former spouse was living and that neither a divorce nor an annulment was ever procured. Goff v. Goff, 52 Cal. App. 2d 23, 125 P. 2d 848; Clendenning v. Parker, 69 Cal. App. 685, 231 Pac. 765. No suggestion was made here that Lucille Gersten was not living on the date of Albert’s marriage to Bernice, and we know that the California interlocutory decree which she obtained had not become final on that date. Section 150.1 of the Civil Code of California provides: Sec. 150.1 Foreign divorce of parties domiciled in state; effect A divorce obtained in another jurisdiction shall be of no force or effect in this State, if both parties to the marriage were domiciled in this State at the time the proceeding for the divorce was commenced. Under California law, actual domicile is necessary to give a court jurisdiction for divorce proceedings, and where there is no domicile there can be no valid divorce. In re McNutt’s Estate, 36 Cal. App. 2d 542, 98 P. 2d 253. The State of California was a legitimate party involved in any divorce proceedings between Albert and Lucille Ger-sten, and its courts have sole and exclusive jurisdiction over the marriage status of those domiciled within its boundaries, as all three parties Rere concerned were. Foreign divorce decrees obtained on assumed residence are not in good faitb and are open to attack in the State of true matrimonial domicile. Kegley v. Kegley, 16 Cal. App. 2d 216, 60 P. 2d 482; Roberts v. Roberts, 81 Cal. App. 2d 871, 185 P. 2d 381. The divorce which Albert obtained in Mexico therefore was of no force and effect in California, since it was obtained through assumed residence. In re Davis’ Estate, 38 Cal. App. 2d 579, 101 P. 2d 761. The Civil Code of California, section 61, provides: Sec. 16. Bigamous and polygamous marriages; exceptions, absentees A subsequent marriage contracted by any person during tbe life of a former husband or wife of such person, with any person other than such former husband or wife, is illegal and void from the beginning, unless: 1. The former marriage has been annulled or dissolved. In no case can a marriage of either of the parties during the Ufe of the other, he valid in this state, if contracted voithin one year after the entry of an interlocutory decree in a proceeding for divorce. [Emphasis added.] We think it clear, under the express provisions of the California Code, that Albert and Bernice, who were both residents of the State throughout 1950, were in no position to marry until such time as Albert became finally divorced from his wife, Lucille. The marriage between Albert and Bernice was specifically prohibited by section 61, and void from the beginning. In re Elliott's Estate, 165 Cal. 339, 132 Pac. 439; In re Gregorson's Estate, 160 Cal. 21, 116 Pac. 60; Parmann v. Parmann, 56 Cal. App. 2d 67, 132 P. 2d 851; People v. Little, 41 Cal. App. 2d 797, 107 P. 2d 634; Vickers v. State Bar of California, 32 Cal. App. 2d 247, 196 P. 2d 10. We therefore conclude that the respondent correctly determined that petitioner Albert Gersten and Bernice Anne Gersten were not legally married on December 31, 1950, and were not entitled to file a j oint F ederal income tax return for such year. The fifth and final issue raised herein is whether the business of J. Richard Company was substantially similar to the trade or business of Lawrence Land Company, within the meaning of section 430 (e) (2) (B) (ii) of the 1939 Code,[8] for purposes of computing its excess profits tax liability for its fiscal period March. 1, 1950, to December 31,1950. Section 430 imposed an excess profits tax on the income of corporations for each taxable year ending after June 80, 1950, and beginning before January 1, 1954. Subsection (e) of such section imposed a lesser rate of tax in the case of corporations which commenced business after July 1, 1945, and whose fifth taxable year ended after June 30, 1950. The rates of tax so provided were as follows: First and second year, 5 per cent; third year, 8 per cent; fourth year, 11 per cent; fifth year, 14 per cent. For purposes of determining a corporation’s years of existence, the subsection provided that, to the actual number of years which a new corporation had been in existence, there was to be added the years prior to its incorporation in which any other corporation had been in existence, if such old corporation was engaged in a trade or business substantially similar to the trade or business of the new corporation, and if such old corporation was controlled by not more than four persons who also controlled the new corporation. Lawrence Land Company was incorporated on March 25, 1949, and dissolved on December 31, 1950. In computing its excess profits tax liability under section 430, it claimed that it was a second year corporation within the meaning of the statute. J. Richard Company was incorporated on July 10, 1947, and dissolved on June 22, 1950. Respondent determined that since Albert Gersten and Myron P. Beck owned all of its stock, and since they and Milton Gersten owned all of Lawrence’s stock, and since J. Richard Company’s business was substantially similar to that of Lawrence, that the years of J. Richard Company’s existence prior to the incorporation of Lawrence must be added to those of Lawrence for the purposes of section 430 (e) (2) (B) (ii), and that Lawrence was therefore in its fourth taxable year rather than its second. We think the respondent’s determination was correct. Obviously, both corporations were engaged in the subdividing of tracts of land and in the construction and sale of houses, which we are satisfied was substantially the same “trade or business” within the meaning of the statute. The petitioner attempts to find support for a contrary conclusion in the language of the report of the Senate Committee on Finance, S. Eept. No. 781, 82d Cong., 1st Sess. (1951), p. 78. The report states : These special ceiling rates available to new corporations in their period of development are not to be available to new corporations created as the result of either a tax-free reorganization or a taxable transaction of the type where, under your committee’s action, the purchasing corporation would be entitled to base its income credit on the earnings experience of the predecessor. Tour committee believes that such corporations do not truly represent “new business.” * * $ It further states, however, “They [special ceiling rates] are also denied new corporations which are controlled by persons owning an old corporation engaged in the same business through old corporations.” We think the language of the statute itself so clear that no resort need be had to its history in interpreting what it means. But certainly the committee report above referred to does not support a result contrary to the one which we reach here. The businesses of the two corporations were not only similar, but, to our way of thinking, identical. We conclude that the respondent correctly determined that Lawrence Land Company was in its fourth taxable year within the meaning of the statute. Decisions will Toe entered under Bule 50. Colony, Inc., was affirmed 244 F. 2d 75, but there was no appeal on the comparable question herein. SEC. 51. INDIVIDUAL RETURNS. (b) Husband and Wire.— (1) In general. — A husband and wife may malte a single return jointly. Such a return may be made even though one of the spouses has neither gross income nor deductions. If a joint return Is made the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several. SEC. 430. IMPOSITION OF TAX. (e) New Cokpobations.— ******* (2) Fibst five taxable teaks. — For the purpose of this subsection— ******* (B) The taxpayer shall be considered to have been in existence and to have had taxable years for any period during which it or any corporation described in any clause of this subparagraph was in existence, and the taxpayer shall be considered to have commenced business on the earliest date on which it or any such corporation commenced business: ******* (ii) Any corporation if a group of not more than four persons who control the taxpayer at any time during the taxable year also controlled such corporation at any time during the period beginning twelve months preceding their acquisition of control of the taxpayer and ending with the close of the taxable year; but only if at any time during such period (and while such persons controlled such corporation) such corporation was engaged in a trade or business substantially similar to the trade or business of the taxpayer during the taxable year. For the purpose of this clause, the term "control” means the ownership of more than 50 per centum of the total combined voting power of all classes of stock entitled to vote, or more than 50 per centum of the total value of shares of all classes of stock. A person shall not be considered a member of the group referred to in this clause unless during the period referred to in this clause he owns stock in such corporation at a time when the members of the group control such corporation and he owns stock in the taxpayer at a time when the members of the group control the taxpayer. For the purpose of this clause, the ownership of stock shall be determined in accordance with the provisions of section 503, except that constructive ownership under section 503 (a) (2) shall be determined only with respect to the individual’s spouse and minor children.