**SOMPORTEX LIMITED**

v.

**PHILADELPHIA CHEWING GUM CORP.**

v.

**BREWSTER LEEDS & CO., Inc.**

and

**M. S. International, Inc.**

Civ. A. No. 69–1519.

United States District Court, E. D. Pennsylvania.

Oct. 2, 1970.

James J. McCabe, Jr., Philadelphia, Pa., for plaintiff.

Marvin Comisky, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

JOHN W. LORD, Jr., Chief Judge.

Before the Court in the above-captioned case is plaintiff's motion for summary judgment. The case presents an interesting and somewhat unique situation involving the enforceability of a foreign judgment which was acquired in England by the plaintiff, Somportex, Ltd. Counsel for both plaintiff and defendant have ably briefed and argued their respective positions.

A summary of the somewhat complex factual background will be helpful. In May 1967, plaintiff, a British Corporation, instituted suit against the defendant, Philadelphia Chewing Gum Corporation, an American Corporation, for an alleged breach of contract. It obtained leave of the Queen's Bench Division of the High Court of Justice in England to issue a writ of summons against the defendant and to serve notice on defendant at its offices in Havertown, Pennsylvania. After receipt of this notice, consultation with its American counsel, who in turn consulted a British firm of solicitors, defendant, on August 9, 1967, entered a conditional appearance in England. This action was taken without prejudice to an application to set aside the writ.[1] On August 18, 1967, within the permissible time period, defendant sought an order having the writ and the service of the writ set aside for lack of jurisdiction. In its summons, the defendant alleged that there was no contract between the parties, or alternatively, that if there was an agreement, it was not made in Great Britain, nor by an agent of the defendant who traded or resided in England, nor by its terms or implication was to be governed by English law.[2] Due to the summer recess no hearing was set until November 13, 1967. During this three month period, defendant changed its strategy and, not

1. R.S.C., Ord. 12, r. 7 & 8 state that a conditional appearance shall be treated for all purposes as an unconditional one unless the party moves within fourteen (14) days for an order having the writ set aside.

2. These are the grounds which, under English law, would permit the granting of a writ of summons and authorizing it to be served extraterritorially.

wishing to do anything which might result in its submitting to the English court's jurisdiction, decided to withdraw its appearance altogether. The first summons to come before the master was defendant's summons to have the writ set aside. In accord with its new plan of action, defendant did not pursue this summons and the master, by default, dismissed it. However, the master further ordered that the order not be drawn up for seven days so as to allow defendant the opportunity to withdraw its appearance. On November 17, 1967, the defendant, alleging that its conditional entrance of appearance was based on mistake, applied to the court to allow it to withdraw.[3]. This request was granted by the master on November 27, 1967, which order also set aside the November 13th order dismissing the defendant's summons. On January 17, 1968, Judge Milmo of the Queen's Bench Division dismissed plaintiff's appeal from the master's order. Plaintiff appealed this decision to the Court of Appeal of the Supreme Court of Judicature. The two judges of that court who initially heard the appeal were unable to agree upon a result. Thereafter, on February 27, 1968, the court, this time composed of three judges, unanimously reversed the Queen's Bench and master's decision and held that defendant's conditional appearance was not entered by mistake but rather was "a wise course of action deliberately decided on by eminent firms in England and the United States after consultation." Somportex, Ltd. v. Philadelphia Chewing Corp., [1968] 3 All E.R. 26, 29. The court therefore ordered the appearance to stand, as well as the original November 13th order of the master which dismissed the defendant's summons which sought to have the writ and its extrater-

ritorial service set aside. The court, however, did grant the defendant an extension of time within which it could appeal the master's order of November 13th which was given in default. At this juncture defendant took no further steps in England except to have its British solicitors withdraw from the case. On May 28, 1968, Somportex filed in the English court a "Statement of Claim" setting forth the alleged cause of action against the defendant for breach of contract. This statement, along with a letter from Somportex's solicitors explaining the posture of the case, was served on the defendant at its Havertown offices. The defendant acknowledged receipt of these papers but took no further steps to defend the action. This course of action resulted in a default judgment being granted against the defendant. On July 1, 1969, plaintiff instituted suit in this Court to enforce the default judgment obtained in England.[4]

As the Court noted earlier, this factual background has resulted in a rather unique situation. Most problems relating to the enforcement of foreign money judgments arise out of one of two fact situations. The first situation arises where the defendant, even though he has notice that a suit has been instituted against him in the foreign country, takes no action to defend the suit in that country. In this situation, the foreign court would find jurisdiction and enter a default judgment on the merits. Thereafter, when the successful plaintiff attempted to enforce this judgment in the United States, it is clear that the defendant would be able to collaterally attack the finding of jurisdiction by the rendering court. This would necessitate an examination by the enforcing court of the underlying facts which allegedly supported the finding of jurisdiction.

---

3. R.S.C., Ord. 21, r. 1 provides: A party who has entered an appearance in an action may withdraw the appearance at any time with leave of the court.

4. At the same time defendant answered the complaint it filed a third-party complaint against the third-party defendants. On November 14, 1969, Judge Body of this

Court dismissed the third-party complaints against Brewster Leeds & Co., Inc. and M. S. International, Inc. Chief Judge Lord, on February 18, 1970 denied defendant's motion for a determination under Rule 54(b) of the Federal Rules of Civil Procedure.

Transposed to the facts of the instant case, if defendant, Philadelphia Chewing Gum, had taken no steps whatsoever to defend the suit in England, and a default judgment on the merits was entered against it, the defendant would be entitled to collaterally attack this judgment in Somportex's present action designed to enforce the English judgment in this Court.

The second situation is where the defendant enters an appearance in the foreign court which is designed solely to attack the court's jurisdiction, litigates the issue, loses and then takes no further action to defend the merits of the case. The foreign court, having determined that jurisdiction existed would then continue with the merits and enter a default judgment. When the plaintiff attempted to enforce the judgment in the United States, there is some question whether or not a United States court would look beyond the judgment to the already litigated issue of jurisdiction. If the judgment were that of a sister state, rather than a foreign judgment, then the requested court could not relitigate the issue of jurisdiction. Sherrer v. Sherrer, 334 U.S. 343, 68 S. Ct. 1087, 1097, 92 L.Ed. 1429 (1948). The Restatement (Second) of Conflict of Laws § 98 & Comments c and d calls for the recognition and enforcement of a foreign judgment in these circumstances. Utilizing the Restatement approach and applying these facts to our case if the defendant had litigated the issue of jurisdiction, i. e. was there a contract that was to be governed by English law, this Court would not reexamine that determination.

The fact situation in the instant case presents a different situation. Unlike the first situation, the defendant has taken some action in England. Philadelphia Chewing Gum entered a conditional appearance, which after final litigation on the question of whether the appearance was entered by mistake, has since become a general appearance.[5] How-ever, unlike the second situation, the defendant has not litigated the underlying jurisdictional basis for the suit. Therefore the Court is confronted with a situation which falls somewhere between the more usual situations.

The issue of whether or not a foreign judgment will be enforced by a federal district court, having jurisdiction by means of diversity, is governed by the law of the state where the federal court is located. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Svenska Handelsbanken v. Carlson, 258 F.Supp. 448 (D.Mass.1966). Therefore the instant case is controlled by Pennsylvania law under which it is clear that the basis for enforcing foreign money judgments is comity, not full faith and credit. Christoff Estate, 411 Pa. 419, 192 A.2d 737 (1963), cert. denied 375 U.S. 965, 84 S.Ct. 483, 11 L.Ed.2d 414 (1964); Commonwealth ex rel. Thompson v. Yarnell, 313 Pa. 244, 169 A. 370 (1933). While comity is a nebulous term and the incantation of the term by itself sheds little light on the subject, the Supreme Court, in the landmark case of Hilton v. Guyot, 159 U.S. 113, 16 S. Ct. 139, 40 L.Ed. 95 (1895), has defined it as "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." Id. at pp. 163–164, 16 S.Ct. at p. 143. The Supreme Court of Pennsylvania further quoted the Hilton decision:

"* * * When an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens * * *

5. See note 1 supra.

and the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is *prima facie* evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that, by the principles of international law, and by the comity of our own country, it should not be given full credit and effect." Christoff Estate, *supra,* 411 Pa. at 423, 192 A.2d at 159–160, quoting Hilton v. Guyot, *supra,* 159 U.S. at p. 205, 16 S.Ct. 139.

■■ In its brief plaintiff suggests that this Court need not look beyond the default judgment except to satisfy itself that the requisite preconditions for the enforcement of a foreign judgment, as espoused in Hilton v. Guyot, *supra,* have been met. While we agree that the Court need not look beyond the foreign judgment and examine the merits, it is clear that, under accepted practices of comity, an enforcing court should satisfy itself that the rendering court had, in the international sense,[6] jurisdiction over the defendant. This Court finds that the rendering court, the Queen's Bench Division of the High Court of Justice, had personal jurisdiction over the defendant by means of the defendant's appearance, albeit originally designed to attack jurisdiction, which it made in the foreign court. Moreover, it is clear that one of the acceptable bases

of jurisdiction which enforcing courts will recognize as a basis for enforcing a foreign judgment is a voluntary appearance in the rendering court by the defendant.

■ In reaching this decision, which is only one of the requisite conditions for our recognizing and enforcing the English judgment, the Court has utilized a two-step approach which we find is necessitated by the peculiar facts of the case. First, as has been stated, the Court recognizes that it must be satisfied that the rendering court had jurisdiction in the international sense to grant the judgment. The Court finds this to be particularly true where the jurisdictional basis on which the original suit was based—that there was a contract which was to be governed by English law—has never been litigated. In this respect our case, and the Court's approach to the problem, parallels the situation where the defendant chooses not to litigate in the foreign court, but rather chooses to collaterally attack the judgment when it is pleaded in the United States. However, unlike the situation where the defendant has made no effort to defend in the foreign court, the defendant in this case has litigated the issue of its appearance. The Supreme Court of Judicature, in a unanimous opinion held that "no mistake has been shown such as to warrant our allowing this appearance to be withdrawn. I would therefore allow the appeal [reversing the Queen's Bench Division and the master]. The appearance will stand. So will the original order which was made by the master on November 13 dismissing the application to set aside. The writ will therefore stand." Somportex, Ltd. v. Philadelphia Chewing Gum Corp., *supra* at 29. The decision that unless defendant took steps to

---

6. While a nation may have jurisdiction over a party pursuant to its local rules, it is possible that the rule on which the foreign court bases its judgment would not be recognized by other nations as sufficient so as to enable them to enforce a judgment based on it. A common example of such a local rule is Article 14 of the Civil Code of France (1804) under which the French nationality of the plaintiff is a sufficient ground for jurisdiction.

quash the writ,[7] it had submitted itself to the court's jurisdiction, was the product of extended litigation in which both sides were represented by prominent counsel. Since the English court's default judgment was based on having personal jurisdiction through the appearance of the defendant, and not on the underlying jurisdictional claim, the fact that this issue was fully litigated makes our case similar to the second situation. Therefore, rather than making an independent determination of jurisdiction which the Court would normally do where there is a default judgment and since the underlying jurisdictional issue has never been litigated, the second step in our approach will be to give conclusive effect to the English court's determination that defendant made a knowing choice to enter an appearance which, by virtue of English law and the failure of the defendant to pursue its motion to quash the writ, became a general appearance.

In adopting the English court's findings and utilizing them rather than making an independent examination of jurisdiction, this Court feels that it is acting in accord with the overall objectives of comity. The Supreme Court of Pennsylvania has said in this regard that Pennsylvania courts will treat the judgments of foreign courts with the greatest respect, keeping in mind however, that the primary duty of a court is to see that justice is done. Christoff Estate, *supra*, 411 Pa. at p. 423, 192 A. 2d 737. In this case the Court feels that it is able to accommodate both these objectives. By recognizing and applying the English court's finding that the defendant submitted itself to the court we are holding in high esteem the judgment of the foreign court. In affording the English judgment the effect that we have, we are, of course, mindful that the system which rendered it is the very fount from which our system developed; a system which has procedures and goals which closely parallel our own. Surely it could not be claimed that the English system is any other than one whose "system of jurisprudence [is] likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, * * *." Hilton v. Guyot, *supra*, 159 U.S. at 202, 16 S.Ct. at 158. The Court also feels that the recognition and use of this foreign judgment best serves the ends of justice. Defendant, a large Pennsylvania based corporation, after consultation with prominent counsel in both the United States and England, entered an appearance in England. At this juncture the defendant had determined to pursue, at least to some extent, the action in England. Regardless of the issue of mistake, this Court feels that the defendant had crossed its Rubicon. Obviously such action should not be taken lightly and we do not consider it unfair or unjust to hold the corporation bound by the resolution of the issue that it put in litigation and did in fact fully litigate. Furthermore, we find the English procedure with respect to appearances perfectly compatible with the goals of justice and our concept of due process.[8] The conditional appearance al-

---

7. Lord Denning, M.R. went on to say immediately after the above quoted passage that "[o]n the other hand, if the American company would wish to appeal from the order of Nov. 13, I see no reason why the time should not be extended and they can argue that matter [the underlying jurisdictional issue of whether there was a contract which was to be governed by English law] out at a later stage if they should so wish."

8. Comment d to § 81 of the Restatement (Second) of Conflicts entitled Special Appearance, What law determines effect of special appearance, states: "An individual subjects himself to the judicial jurisdiction of the state by appearing in an action for the sole purpose of objecting that the court has no jurisdiction over him. It is for each state to determine for itself whether to exercise judicial jurisdiction under such circumstances." While it is true that unlike the English rule, all states of the United States currently refrain from exercising jurisdiction over a defendant where he has appeared solely to challenge the jurisdiction of the

lowed by R.S.C., Ord. 12, r. 7 enables the defendant to assert its jurisdictional defense without otherwise submitting itself to the court's jurisdiction. In the normal situation, it is only after an adverse final determination on the jurisdictional issue that the conditional appearance becomes a general one. The conditional appearance provided for in Rule 7 is couched in terms that require an affirmative act which results in the plaintiff's writ being quashed or the appearance becomes a general one. It was due to this that the defendant's act of entering a conditional appearance in this case resulted in a general appearance without the determination which the special appearance is designed to bring about. The Court does not feel that defendant can complain of this result since it necessarily flowed from its decision not to follow the normal procedure of attacking the writ which it initiated by entering a conditional appearance rather than a general one or none at all.

Moreover, to examine the jurisdictional basis on which the suit was originally predicated, as defendant would have the Court do, would have the effect of rendering meaningless the ruling of the Supreme Court of Judicature. If the English court had decided in favor of the defendant and allowed it to withdraw its appearance the case would have been placed in the same posture that it would have been if the defendant originally had taken no action. The English court would have entered a default judgment which defendant could have collaterally attacked when sued in this Court. If this Court would now examine the underlying jurisdictional issue of whether or not there was a contract which was to be governed by English law, rather than ᷨely on the litigated issue of defendant's appearance, we would be doing exactly what defendant would have accomplished had it been successful in England. This

Court will not allow the defendant to do indirectly what it failed to accomplish directly.

### Reciprocity

■ In its brief (p. 13) and supporting affidavit, defendant argues that the English judgment should not be recognized and enforced by this Court because an English court would not enforce an American judgment under similar circumstances. The position that reciprocity is an essential element in determining whether or not to enforce a foreign judgment was first enunciated in 1895 by the Supreme Court in the *Hilton* case. In that case, the Court found all of the requisite conditions for enforcement of the French judgment had been met except that a French court, sitting *mutatis mutandis,* would not enforce the American judgment. Therefore the Court refused to give conclusive effect to the French judgment. However, we do not find the teaching of *Hilton* on reciprocity to be controlling in this case. The *Hilton* decision was a pre Erie R. R. Co. v. Tompkins case and it has never been suggested that it was constitutionally dictated and therefore binding on the states. It is clear, and this Court has so stated earlier in this opinion,[9] that the law governing the enforceability of foreign judgments by a federal court is the law of the state where the court is located. Therefore, the issue, as this Court perceives it, is whether the courts of Pennsylvania would hold that reciprocity is a necessary precondition to the enforcement of foreign judgments. The issue of the enforceability of foreign judgments has not frequently been litigated in Pennsylvania, and the Court has not been cited to, nor has independent examination revealed any Pennsylvania cases which even intimate that a finding of reciprocity is an essen-

---

court, it is clear that due process does not mandate such a position. Until as recently as 1964, Texas followed the practice of assuming jurisdiction where the

defendant made a special appearance. See York v. Texas, 137 U.S. 15, 11 S.Ct. 9, 34 L.Ed. 604 (1890).

9. See page 6, *supra.*

tial precondition to their enforcing a foreign judgment.

Since its beginning in *Hilton,* the concept of reciprocity has not found favor in the United States. It has often been the subject of criticism by commentators [10] and most courts have refused to follow *Hilton* on this issue. The concept has been expressly rejected by the courts of New York,[11] and has been rejected by statute in California.[12] The courts and commentators have presented cogent reasons for their position that reciprocity should not be the determinative factor in a court's decision on the issue of recognition. The primary reason which has been advanced is that our legal system has adopted a policy that calls for an end to litigation. Whether or not a foreign court would recognize an American judgment is not relevant to this policy. However, it is in furtherance of that objective if litigation which was begun in a foreign court and which is presently before an American tribunal, is brought to an end. The Court finds that the concept of reciprocity is a provincial one, one which fosters decisions that do violence to the legitimate goals of comity between foreign nations. Therefore, absent a positive showing that Pennsylvania would follow the *Hilton* decision with respect to reciprocity, this Court will not presume that it would adhere to such an undermined concept. This Court finds that if presented with the issue, the Pennsylvania courts would follow its neighboring state of New York and expressly reject this concept. We find this to be particularly true since Pennsylvania, like New York, is one of the largest centers of both national and international commercial activities.

## Public Policy

 Defendant also asserts that to enforce the English judgment would violate the public policy of Pennsylvania since that judgment includes in the award of damages an amount for loss of good will and counsel fees. It is a well-established rule of law that a court will not enforce a foreign judgment, be it of a sister state or foreign nation, if to do so would violate the forum's public policy. The courts of a state will not violate a strong state policy in the vindication of a private wrong regardless of whether or not the judgment would otherwise be entitled to enforcement. The Pennsylvania Supreme Court has stated that it will not enforce a foreign judgment which violates " 'a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people [of this Commonwealth] and in their conviction of what is just and right and in the interests of the public weal.' " Christoff Estate, *supra,* 411 Pa. at p. 424, 192 A.2d at p. 739, quoting Mamlin v. Genoe, 340 Pa. 320, 325, 17 A.2d 407 (1941).

In support of its contention that the enforcement of this judgment would violate public policy, defendant has cited Pennsylvania cases which demonstrate that loss of good will and, under normal circumstances, attorney fees, would not be directly recoverable in a similar action instituted in Pennsylvania. Harry Rubin & Sons, Inc. v. Consolidated Pipe Co., 396 Pa. 506, 153 A.2d 472 (1959); Shapiro v. Magaziner, 418 Pa. 278, 210 A.2d 890 (1965). However, merely because the forum has a different rule of law, whether legislatively or judicially founded, does not automatically render the foreign law contrary to the public

10. E. g., 2 Beale, Conflict of Laws, 1385–89 (1935); Goodrich, Conflict of Laws, 605–08 (3rd ed. 1949); Reese, The Status in This Country of Judgments Rendered Abroad, 50 Col.L.Rev. 783, 790–93 (1950).

11. Cowens v. Ticonderoga Pulp & Paper Co., 219 App.Div. 120, 219 N.Y.S. 284, aff'd 246 N.Y. 603, 159 N.E. 669 (1927); Johnston v. Compagnie Generale Transatlantique, 242 N.Y. 381, 152 N.E. 121 (Ct. of Appeals 1926).

12. See Reese, supra n. 10 at 788 n. 29.

policy of the forum.[13] It has long been the law in Pennsylvania that merely because Pennsylvania would not allow a direct recovery in a particular instance, nevertheless it would, in a choice of law situation, allow such a recovery. E. g. Dickinson v. Jones, 309 Pa. 256, 163 A. 516 (1932). Furthermore, Mr. Justice Stern, speaking for the *Mamlin* court, stated: "[f]amiliar illustrations [of judgments which would not be enforced due to public policy] are those involving unreasonable restraints of marriage or of trade, collusive arrangements for obtaining divorces, suppression of bids for public contracts, interference with freedom of conscience or religion." Mamlin v. Genoe, *supra*, 340 Pa. at 325, 17 A.2d at 409. The Court finds that the inclusion of loss of good will and counsel fees in an award of damages is wholly dissimilar to the types of cases enumerated by Mr. Justice Stern. Therefore the Court concludes that while Pennsylvania may not agree that these elements should be included in damages for breach of contract, the variance with Pennsylvania law is not such that the enforcement "tends clearly to injure the public health, the public morals, the public confidence in the purity of the administration of the law, or to undermine that sense of security for individual rights, whether of personal liberty or of private property, which any citizen ought to feel, is against public policy." Goodyear v. Brown, 155 Pa. 514, 518, 26 A. 665, 666 (1893).

For all of the above reasons, and since the Court finds that there is no genuine issue as to any material fact, the Court will grant plaintiff's motion for summary judgment.

### ORDER

And now, to wit, this 2nd day of October, A.D. 1970, it is ordered that plaintiff's motion for summary judgment be and the same is hereby GRANTED.

It is further ordered that, due to the ruling in this case, plaintiff's objections to defendant's interrogatories be and the same are hereby SUSTAINED.

And it is so ordered.

13. E. g., McCurdy's Estate, 303 Pa. 453, 154 A. 707 (1931). See Asher, Public Policy in the Law of Conflicts in Pennsylvania, 13 Temp.L.Rev. 216 (1939).